FARMER, J.
A surgeon with staff privileges sued a hospital for breach of contract, and later added a claim for slander per se, seeking compensatory damages for both claims, as well as punitive damages for the slander. He alleged that the hospital had breached its contract with its medical staff, the Medical Staff Bylaws, by invalidly giving another surgeon exclusive privileges for cardiovascular surgery. The exclusive grant barred him from such surgery even though he had been approved for it by the hospital’s credentialing committee and medical staff leadership. The slander claim involved statements during the litigation by senior executive officers of the hospital that, among others, the doctor was not even “qualified to perform surgery on a dog.”
The jury found the hospital liable on the breach of contract claim and fixed his total damages at $2,817,000, reduced to $1,517,000 because he could have mitigated his losses. In separate proceedings on the slander per se claim, the jury found Lawn-wood liable for the slanders; that Lawn-wood specifically intended to harm him by its per se slanderous statements; that, in fact, it had actually injured him by the statements; and that he suffered no compensatory damages from the slanders but that he was entitled to punitive damages of $5 million from the hospital. After extensive hearings, the trial court denied Lawn-wood’s post trial motions for directed ver-diet and a new trial or a remittitur of punitive damages to a reduced sum.
In the appeal of the contract claim, Lawnwood repeats its trial court argument of statutory immunity from liability to the surgeon. As to the claim of slander per se, Lawnwood presents no appellate issues regarding liability or entitlement to punitive damages. Instead it appeals solely the amount of punitive damages, confining its argument to the contention that $5,000,000 is excessive under the United States Constitution. Before addressing these two issues, we must first examine the evidence supporting the verdicts.[1] A. Facts

1. The Background to Breach of Contract

Dr. Sadow is a graduate of the University of Chicago Medical School. His residency was in general thoracic and cardiac surgery at the Chicago Heart and Lung Institute. That was followed by a 2-year fellowship in cardiovascular and thoracic surgery at Wayne State University in Detroit. He is board certified in cardiovascular, thoracic and vascular surgery.
He settled in south Florida in 1985, beginning his practice on the staffs at hospitals located in Palm Beach Gardens and Jupiter. Patients are typically referred to surgeons of his specialty by cardiologists and primary care physicians. Although he began doing both general thoracic and cardiac surgery, in time he concentrated on cardiovascular surgery (CVS).[2]
*713 He entered into a partnership with a Dr. Downing. Over the years, he perceived that 60-70% of his patients came by referrals from physicians in Martin and St. Lucie counties. He thereupon opened offices in Fort Pierce and Tequesta to handle what was becoming the principal part of his practice. He also observed that a significant number of those patients were indigent, some with only Medicaid benefits.
Lawnwood is a profit seeking corporation. It is owned by Hospital Corporation of America, now known as HCA, based in Tennessee, whose stock is held by investors. The corporation’s senior executive staff — Chief Executive Officer (CEO) and Chief Financial Officer (CFO) — are not elected by the medical staff but are instead appointed by corporate directors. During the time of the events involved in this lawsuit, none of these senior executives were themselves physicians.
Lawnwood is the principal hospital in St. Lucie County. Martin Memorial Hospital is the principal hospital in Martin County, located in Stuart, just south of Fort Pierce (St. Lucie County). At that time, neither Lawnwood nor Martin Memorial were authorized to offer cardiovascular surgery. Hence cardiac surgical patients in these two counties were referred by their cardiologists and primary care physicians to surgeons in Palm Beach County for the surgical procedure. In the late 1980’s Dr. Sadow began seeing increasing numbers of such referrals. He undertook frequent trips to Lawnwood to examine patients and assist referring physicians in assessing their surgical needs.
In 1993 Lawnwood itself decided to seek state governmental agency approval for authority to offer CVS surgery. The hospital prepared an application to the Florida Agency for Health Care Administration for a Certificate of Need (CON) to perform CVS.
Lawnwood’s application was opposed by a number of hospitals in the south Florida region, including Martin Memorial, JFK in Lake Worth, St. Mary’s and Good Samaritan in West Palm Beach, Palm Beach Gardens Hospital, and a Boynton Beach hospital. The CEO of Lawnwood, Trezona, approached Dr. Sadow to assist the institution in the effort to obtain the CON for cardiovascular surgery. At Trezona’s request, Dr. Sadow worked closely with him in preparing the application to the state agency, supplying relevant information and strategy for making the application meritorious.
In its application, Lawnwood explicitly relied on Dr. Sadow’s credentials and experience as a board certified cardiovascular surgeon and his written commitment to practice CVS at Lawnwood when the planned new facility for that purpose finally opened. Accordingly Dr. Sadow planned relocating his practice to the area of Lawnwood, meanwhile ending his partnership with Dr. Downing by mutual agreement.
He wrote letters on Lawnwood’s behalf. He traveled to testify in favor of the CON application. He spoke to various people and groups to generate support for the CON’s approval. He called attention to the fact that a significant number of CVS patients in the Lawnwood service area were indigent, and thereby secured the support of other groups serving the indigent population to favor the application.
Dr. Sadow gave his support for the CON without asking for any commitment that he be given exclusive staff privileges to perform CVS if the CON was approved. And during all of his efforts on Lawn-wood’s behalf, it is clear that Lawnwood did nothing to suggest that Dr. Sadow would be barred from any CVS privileges. To the contrary, in every way Lawnwood *714 fostered the expectation that Dr. Sadow would become a member of the Lawnwood staff for CVS when it became available.
The process for approval took nearly three years. It was not until midyear 1996 that Lawnwood’s CON was finally approved. At about the same time, the corporate owners of Lawnwood changed CEOs, appointing Cantrell as the new chief administrator. With the approval in hand, Lawnwood and its new CEO began work on designing and constructing new facilities for CVS, which would not be completed until 1999.
Several years before this approval, Lawnwood had adopted a set of rules of governance for its Medical Staff, as required by law.[3] Under these Medical Staff Bylaws, staff physicians had the right to elect, retain, and remove medical staff officers, the members of the Medical Executive Committee (MEC), and the various department chairs and vice chairs. These rules specified that the medical staff would recommend which doctors should be allowed to practice in which medical areas. They also provided that exclusive privileges would be limited to only four specified areas. Cardiovascular surgery was not a specialty designated for exclusive privileges.
The Bylaws provided for a Credentialing Committee to recommend initial grants of staff privileges, and a Re-credentialing Committee to recommend renewals of privileges previously granted. The medical staff elects members of these committees in annual elections. The committees make the initial decisions on all applications for first-time grants of privileges and renewals, and then forward their recommendations to the MEC.[4] The MEC in turn makes the final recommendations and forwards them to the Board of Trustees for approval.
The corporate entity operating Lawn-wood is directly governed by a Board of Trustees with its own separate bylaws. The Medical Staff Bylaws specified that the Board of Trustees of the corporate entity owning the Hospital could not “unreasonably withhold” approval of final credentialing recommendations of the MEC. In short, the Board of Trustees agreed that it would approve recommendations by the MEC as to privileges unless it could state a reason with just cause.
The trial evidence as to Dr. Sadow’s competence as a surgeon was substantial and unchallenged. From the late 1980s through 1999, Dr. Sadow had been doing an average of about 150 surgeries per year at Palm Beach Gardens and Jupiter Hospitals, the majority of which were high risk, open heart procedures. He demonstrated a constant mortality rate in the area of 3-4%, which is low for these high risk procedures. Moreover the evidence was that he had been sued only once for medical malpractice, and that suit had resulted in a verdict in his favor (which this court declined to disturb on appeal).[5]
*715 In April 1997 Dr. Sadow filed a formal application for non-exclusive surgical privileges in general thoracic surgery and CVS. There was never any question of his competence, qualifications or experience to perform CVS. His was the only pending application for CVS privileges. Cantrell assured him that his application would be formally approved by the corporation. The Credentialing Committee and the MEC approved his application. In January 1998 Lawnwood formally accepted the recommendations and approved his application, but for general thoracic surgery only. Lawnwood refused to consider his application for CVS, stating only that the new facility was as yet undeveloped.
Actually Cantrell and the corporate owners of Lawnwood had privately decided by then that CVS would be given only under an exclusive grant to a single surgeon or group. They had also privately decided that Dr. Sadow would not be considered for CVS and would be limited solely to general thoracic surgery, in spite of the fact that CVS was his area of practice. In fact, Lawnwood decided that Dr. Sadow’s former partner, Dr. Downing, would be its only candidate for the CVS exclusive privilege.[6]
Dr. Sadow nevertheless filed new applications for nonexclusive CVS privileges in March and April 1998. In June 1998 Cantrell acknowledged to Dr. Sadow that the Board of Trustees wanted CVS privileges to be given exclusively to a single provider. Dr. Sadow tried to dissuade Lawnwood from such exclusivity. He argued that it would be bad for patient care; that patients and their cardiologists need readily available sources in the area for second opinions as to open heart surgery and its alternatives; that competition between surgeons doing CVS benefits the community and patients; and that in any case an exclusive grant to a group normally rejecting Medicaid patients would be against the specific needs of the Lawnwood indigent community — a subject that had figured prominently in their CON application.
In early 1999 Lawnwood received a certificate of occupancy for its new cardiac surgical facility. Once again Dr. Sadow applied for CVS privileges. Once again the MEC approved his application. Once again the Board of Trustees denied it. Significantly, Lawnwood stipulated at trial that its denial of CVS privileges was not based on his competency or qualifications as a surgeon. After a protracted dispute with its medical staff over the issue, Lawn-wood ultimately contracted with Dr. Downing exclusively to perform CVS at Lawn-wood and refused to allow Dr. Sadow to perform CVS.

2. The Defamation

By August 1998 when Pentz became the next CEO of Lawnwood, relations between the Board of Trustees and the Medical Staff had become tense as a result of the decision of the Board of Trustees to override medical staff recommendations as to credentialing, specifically including CVS. Learning of the intent to award CVS privileges exclusively to the single surgeon/group, the MEC created a special committee to determine whether CVS privileges should be added to the Lawn-wood list of exclusive privileges. In July *716 1998 the MEC decided that CVS should be open to all qualified staff surgeons at Lawnwood and not limited to a single provider. Dr. Sadow promptly filed another application for CVS.
In refusing to consider Dr. Sadow’s pending requests for CVS privileges, the Board of Trustees adopted a resolution barring further applications from its current staff, an action pointedly directed at Dr. Sadow. Pentz wrote the Staff Committees and MEC that the search for candidates for CVS privileges was now closed, while simultaneously telling Dr. Downing to file his application with the Credentials Committee. Pentz “tabled” Dr. Sadow’s. In fact the burial of his application for CVS lasted for several years, long after the new cardiac surgical facility opened.
In late 1998 the MEC met once again to consider the CVS issue. Pentz attended the meeting and sought to force the MEC to reject Dr. Sadow’s application in accordance with the resolution of the Board of Trustees. The Chair of the MEC repeatedly ruled Pentz out of order, that Pentz was attempting to interfere on a matter of medical qualifications. Pentz heatedly retorted that the Chair was obstructing the CEO. The MEC again recommended that Dr. Sadow be approved for CVS privileges.
Shortly thereafter, the Board of Trustees wrote the MEC and the two credentialing committees that it had granted Pentz the sole authority to contract for exclusive CVS privileges and to negotiate with Dr. Downing for that purpose. It added that the moratorium on CVS privileges had been modified to that extent only and the committees should begin to review and recommend Dr. Downing and his group. Meanwhile the Board of Trustees requested its corporate parent to investigate the physicians in charge of the credentialing committees at Lawnwood, and especially the Chair of the MEC, to determine whether they had violated their “fiduciary duty” to the stockholders of Lawn-wood.
As provided in the Medical Staff Bylaws, in March 1999 the medical staff held its regular annual elections for staff officers, who ex officio determine the compositions of the credentialing committees and the MEC. The Chair of the MEC now became elected President of the medical staff. The Board of Trustees of Lawnwood responded to the election by passing an emergency resolution removing all these newly elected officers, department chairs and members of the credentialing committees. In their place the Board of Trustees appointed its own choices for all these medical staff positions to govern the medical staff until the next regularly scheduled election. The Board of Trustees justified its unprecedented action by asserting that a “crisis” existed, caused by an alleged failure of the medical staff to engage in “good faith peer review,” a failure to apply credentialing standards properly, a failure to comply with applicable federal and state law, and failure to comply with the standards required by accrediting entities.
In response, the recently elected medical staff officers filed an action in the circuit court for an injunction against the corporate action. They sought an order requiring the Board of Trustees to rescind its action and to reinstate the elected officers. They specifically requested that the injunction require the Board of Trustees to refrain from taking any action restricting, reducing, or impeding the full exercise of authority possessed by the Elected MEC under the provisions of the Medical Staff Bylaws, from exercising or attempting to exercise any powers or authority as Medical Staff Officers or members of the MEC; and for the corporate appointees to relin *717 quish their respective offices to the Elected Officers and the Elected MEC.
The circuit court held an evidentiary-hearing on the injunction and essentially granted all of the relief sought.[7] This court affirmed the injunction, subject to a new hearing on the amount of the bond.[8] While that injunction was on appeal, Dr. Sadow filed the present action, initially claiming only breach of contract.
As a result of the refusal of the Medical Staff to submit to corporate control of credentialing decisions at the hospital, Lawnwood convinced the Florida Legislature to enact the “Hospital Governance Law” applying only to hospitals in St. Lu-cie County. In disregard of the contract with the medical staff that had by then been in force for several years, the statute gave the Board of Trustees of Lawnwood full authority to override credentialing decisions. The Medical Staff officers sued for a declaratory judgment that the statute unconstitutionally impaired the contract between the Medical Staff and the corporation. The trial judge agreed with the medical staff and was affirmed on appeal. See Lawnwood Med. Ctr., Inc. v. Seeger, 959 So.2d 1222 (Fla. 1st DCA 2007). Lawnwood persisted in trying to salvage its legislative victory, but the Florida Supreme Court found the statute unconstitutional. See Lawnwood Med. Ctr., Inc. v. Seeger, 990 So.2d 503 (Fla.2008).
While Dr. Sadow’s lawsuit was pending, in November 2001 Lawnwood hired Dr. Pinon as a new emergency room physician to staff Lawnwood’s Walk-In Clinic in Fort Pierce, several blocks from the hospital. A few weeks after he arrived, Lawn-wood arranged for an “open house” reception at the Clinic to introduce Dr. Pinon and its remodeled Walk-In Clinic facilities to the community. The occasion was held in the early evening hours after work. Just a day or two before the open house, however, another new CFO of Lawnwood, Dunwoody, then made these statements to Dr. Pinon: that Dr. Sadow was a bad doctor, that he had been suing the hospital, that he was not a good person, and that he was not someone to whom he should refer patients.
At the open house, there were “a lot of people” at the Clinic for the occasion. Some were patients, some were referring physicians, and there were others. It was on this occasion that Dr. Pinon met Dr. Sadow for the first time. He had stepped into Pinon’s office at the Walk-In Clinic during the reception, accompanied by other physicians to introduce himself. At that point, Pentz and Dunwoody (CEO and CFO) also approached Dr. Pinon in the same area. Dr. Sadow left, crossing paths with the two corporate officers.
Now inside the office — having just encountered Dr. Sadow leaving the area— Dunwoody stated to Dr. Pinon: “this is part of the problem that we’ve discussed to [sic] you about ... Dr. Sadow and doctors in the community.”[9] Pinon responded that he was new to the area and didn’t know the doctors in the community. Pentz and Dunwoody then referred to a book containing a list of all the doctors in the community and their photographs, saying it would reveal the “problem doctors”.
A day or two later, Dunwoody, a Mr. Loveless, and the office manager Ms. Rob *718 ertson met with Dr. Pinon in his office. Dunwoody proceeded to show him a book of staff physicians at Lawnwood. He placed a dot next to the entry for “certain colleagues you should not refer patients to,” one of whom he specifically recognized from the open house as Dr. Sadow. Dr. Pinon responded that Dr. Sadow seemed to him “like a really nice guy5’ and asked Dunwoody what the problem was with him. Dunwoody responded that it was a long story but then made these statements:
“ ‘Dr. Sadow was in partnership] with another doctor who we gave an exclusive contract to for open heart surgery. There was some disagreement between Dr. Sadow and his partner. He didn’t get the contract. And now he is suing us. And he is not a good doctor. He has had multiple lawsuits filed against him. He is a bad person. And quite frankly, Dr. Pinon, I would not send my dog to him for surgery. And you, being from the military, and if you care about your patients, you would do the same, ’ quote unquote.” [e.s.]
Dr. Pinon confirmed that Dunwoody’s statements were in the presence of Loveless and Robertson. Dr. Pinon also made clear that he understood Dunwoody to be speaking on behalf of the Lawnwood corporation.
Dr. Pinon testified, describing the comments’ impact on him:
“When Mr. Dunwoody made those statements, he was the chief financial officer of Lawnwood Medical Center. In my mind it would have been like a general telling me, ‘You are not to do this, this, and that.’ So I had very mixed, confused feelings. I hadn’t been here very long. So I was — I was — I want to use the word appalled. I was concerned because this was my first civilian job, and I knew Lawnwood HCA, the corporation, sub-corporations, was a very big corporation. And I couldn’t — I couldn’t conceive that they would allow that type of action to happen.”
Dr. Pinon admitted that he related Dun-woody’s statements about the competency of Dr. Sadow to other doctors. He testified that he repeated the comments to Dr. Fromang, a urologist; Dr. Marshall, a radiologist; Dr. Ramesh, a pulmonologist; Dr. Perry Lloyd, a pulmonologist; and Dr. Shadani, a cardiologist. He further explained that he had been told the same bad things about each of them; that a couple of them who had been “fired” were also suing the hospital because of some issue that happened with the medical staff, that these fired doctors were replaced with other doctors appointed by the corporation, that all of them were “bad doctors, troublemakers, and that I had no business referring any patients to them.” He said, “I have been told that they were just as horrible and malicious, and as horrible as Dr. Sadow.” He explained that “the dots” on the photos to which he referred included the doctors just mentioned: Fromang, Nayyar, Lloyd, Marshal; that all had lawsuits against the hospital, that all had been treated the same way; and that Dunwoody’s statements made all of that clear. Sometime later, Dr. Pinon again asked CEO Pentz what was wrong with Dr. Sadow. Pentz responded: “That is a closed case. As long as I am CEO of this hospital, Dr. Sadow will never practice cardiovascular surgery.”
At no time after the claim of slanders per se had been brought to its attention by plaintiffs counsel did Lawnwood ever offer a retraction. In its pleadings, Lawnwood denied that any such statements had been made. By way of affirmative defense, Lawnwood also pleaded that even if the statement about not sending a dog to Dr. Sadow had been spoken, it was merely *719 “rhetorical hyperbole”. At trial it offered testimony that if the jury found that Dun-woody had made the statements he was “just kidding”, that the statements were “just an epithet”, and that they were “not really anything” and should be given little weight.
Dr. Sadow testified that he felt embarrassed, humiliated and shamed by the slanders. He said that every time he entered Lawnwood Hospital he was reminded of them and could hardly escape thinking about them. He explained that, as a result of the credentialing dispute and the slanderous statements of the Hospital, in time all his referrals from St. Lucie and Martin counties “dried up” and eventually his practice of open heart surgery came virtually to an end in this area. He added that he was also in a contentious divorce when these events were occurring. Ultimately he was offered surgical positions in Chicago and Tennessee, but he turned them down because his young children resided primarily with their mother here, and he did not want to live far away from them.
At the close of the first phase of the trial, Dr. Sadow’s counsel argued that Lawnwood’s slanders were “outrageous and intentional”. He argued that: “No doctor on the medical staff in good standing of the hospital should be subjected to that type of treatment by a member of the senior management team of the hospital, speaking on behalf of that hospital.” More specifically he argued that the surgery-on-a-dog statement could not possibly be considered forgivable hyperbole, “rhetorical or otherwise” because it conveyed only one meaning: “It exposed Dr. Sadow to ridicule in his business and profession. And that was the intent.”
At the close of the first phase of trial the Court instructed the Jury as to entitlement to punitive damages for the slander per se claim that:
“Punitive damages are warranted if you find, by clear and convincing evidence, that Lawnwood’s primary purpose in making the statement was to indulge ill will and hostility and intent to harm Dr. Sadow. If you find for Dr. Sadow and against Lawnwood, and you also find that clear and convincing evidence shows that Robert Dunwoody was personally guilty of an intentional misconduct which was a substantial cause of loss, injury or damage to Dr. Sadow, and that such conduct would warrant an award of punitive damages against him, in accordance with the standards that I have mentioned, then in your discretion, you may determine that punitive damages are warranted against Lawnwood.”
The jury returned a verdict finding liability against Lawnwood for the slanders per se. As to compensatory damages for the defamations, it specified zero damages as to each category, including nominal damages. The Jury found, nonetheless, that punitive damages were warranted.
The evidence in the second phase of the trial was devoted almost exclusively to the financial condition of the corporate structure of Lawnwood. Dr. Sadow offered evidence, not contradicted by Lawnwood, that at the time of trial Lawnwood had a net worth exceeding $100 million. Dr. Sa-dow’s financial expert witness relied primarily on annual financial statements of the corporation for the years preceding trial. The expert testified that punitive damages from $30-38 million would not financially destroy the hospital. On its part, Lawnwood produced as its only witness a Director of Public Relations and Marketing who testified primarily as to new ethics training recently started at the hospital.
*720 In closing argument, Dr. Sadow’s counsel never suggested a specific sum for punishment. He did make clear, however, that he was not seeking the amount his expert had suggested as the ceiling on damages that would not ruin the corporation, the figure of $30-38 million. He stressed several times that he sought only an amount the Jury determined would be sufficient to punish and deter, not a sum that would financially destroy the institution.
He emphasized that the slanders were not limited to a single statement, but included all the statements described by Dr. Pinon. He added that the slanderous statements were not solely about Dr. Sa-dow but were actually directed at all physicians who had sued the Hospital, who were described as being “just as bad as he was,” suggesting a pattern or practice on the part of Lawnwood.
He described the slanders as egregious, pointing out they came from one of the most senior officers of the corporation. He argued that the statements had “a high probability of injury and damage” to Dr. Sadow. He argued that Lawnwood’s slanders about its own physicians were “improper, unethical and immoral” and had in fact damaged him.
The trial Judge gave the Florida Standard Jury Instruction on punitive damages, adapted to the issues in the case.[10] *721 The trial Judge also used the form of verdict contained in the standard instructions. The Jury’s unanimous verdict was that Lawnwood specifically intended to harm Dr. Sadow, that Lawnwood had in fact harmed him by the slanders per se. The Jury also found that in slandering Dr. Sadow Lawnwood had not been motivated solely by unreasonable financial gain. The Jury assessed punitive damages against Lawnwood in the sum of $5,000,000.

B. The Claim of Immunity from Contract Liability

Lawnwood’s claim of immunity is founded on § 395.0191(7).[11] It argues that the statute must be construed as written.[12] We agree with that ever-present rule of statutory comprehension.
It is indeed the first principle of statutory interpretation that the meaning of statutes is derived primarily from the text employed by the Legislature.[13] If the Legislature’s words are not ambiguous, we accord them their plain meaning.[14] All parts of a statute should be given effect if possible, for the Legislature is presumed not to have enacted statutory terms having no purpose.[15] Thus we strive to avoid
reading statutes so that part of its terms have no effect.[16] As the court cautioned in Donato v. American Telephone and Telegraph Company, 767 So.2d 1146 (Fla.2000): “we are precluded from construing an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.” [e.s.] 767 So.2d at 1150-51.[17] We conclude that Lawnwood’s construction of the statutory immunity text would have us ignore an explicit limitation as to its extent, thereby enlarging the grant of immunity beyond its plain meaning.
The provisions of § 395.0191 lay down general rules for hospitals in setting up procedures and standards for staff membership and clinical privileges. The immunity of § 395.0191(7) is not a broad, general grant immunizing every kind of hospital liability after granting clinical privileges. The plain text confines its immunity only to “aetion[s] arising out of or related to carrying out the provisions of this section ” [e.s.]. It is thus a specific, targeted, grant of partial immunity extending only for its credentialing decisions.[18]
*722 Dr. Sadow did not allege or rely on any violation of the statute. Instead he alleged and proved that, contrary to its own Medical Staff Bylaws, Lawnwood invalidly granted an outside surgeon exclusive CVS privileges, and used it to stop Dr. Sadow from performing CVS. He showed that the Medical Staff Bylaws, accepted and approved by the corporate Board of Trustees, did not authorize exclusivity in CVS. He proved that he had been repeatedly recommended for CVS by the hospital’s own Credentialing Committee and approved by the MEC. He proved that Lawnwood’s refusal to accept the MEC approval was not supported by “a valid reason under the circumstances”, the standard instructed by the trial Judge. By giving one surgeon an unauthorized exclusive and using that invalid action to bar Dr. Sadow from CVS, he proved that Lawnwood was simply guilty of breach of contract.[19]
Under the facts and circumstances proven at trial, we agree with the trial judge that his claim for breach of contract was not barred by the statutory immunity provision. We therefore affirm on this issue.

C. Punitive Damages

We now confront Lawnwood’s contention that the amount of punitive damages is excessive under the United States Constitution. In Engle v. Liggett Group Inc., 945 So.2d 1246 (Fla.2006), the court recognized that differing standards of review, one under state law and another under federal law, may now apply to punitive damages in Florida. But Lawnwood does not here challenge the amount of punitive damages under Florida law — its sole contention is that the amount is excessive under federal law. We therefore review the federal issue raised by Lawnwood under its de novo standard of review.[20]
The federal law argued by Lawnwood is part of a series of decisions by the United States Supreme Court. It relies on two of those decisions, State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) [State Farm], and BMW of North America Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) [BMW]. Lawnwood argues that BMW and State Farm both hold that the Due Process Clause of the Fourteenth Amendment categorically bars any punitive damages exceeding a stated ratio with compensatory damages, usually 3:1 or 4:1. Dr. Sadow responds that Lawnwood is incorrect as to the scope of these holdings. He contends that State Farm and BMW actually disclaim applying the ratio to all punitive damages awards, and that both decisions explicitly hold that the ratio may not apply in eases involving intentional and malicious conduct. We conclude that TXO Production Corporation v. Alliance Resources Corporation, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993), would also seem *723 applicable. TXO held that punitive damages of $10 million imposed for intentionally malicious misconduct are not improper even though actual losses were less than $20,000.
BMW was the first to apply a ratio as the proper test of proportionality in a specific case. But the opinion declared that proportionality is not always a matter of numerical comparison between compensatory and punitive damages:
“we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if far example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. It is appropriate, therefore, to reiterate our rejection of a categorical approach. Once again ... we need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case.” [e.s.]
517 U.S. at 582-83, 116 S.Ct. 1589. The Court explained:
“In our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. Most States that authorize exemplary damages afford the jury similar latitude, requiring only that the damages awarded be reasonably necessary to vindicate the State’s legitimate interests in punishment and deterrence. Only when an award can fairly be categorized as ‘grossly excessive’ in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.” [e.s., c.o.]
517 U.S. at 569, 116 S.Ct. 1589.
State Farm was the next case to apply a ratio but repeated that: “We decline again to impose a bright-line ratio which a punitive damages award cannot exceed.” 538 U.S. at 425, 123 S.Ct. 1513. The Court made clear that “ratios greater than those we have previously upheld may comport with due process where ⅛ particularly egregious act has resulted in only a small amount of economic damages.’ ” [e.s.] 538 U.S. at 425, 123 S.Ct. 1513. State Farm underlined that “[t]he precise award in any case ... must be based upon the facts and circumstances of the defendant’s conduct and the harm to the plaintiff.” [e.s.] 538 U.S. at 425, 123 S.Ct. 1513. States may vary the level of punitive damages in disparate classes of cases to reflect different policies.
In considering these cases, we understand that the federal rule of a fixed ratio between punitive and compensatory damages was intended to apply primarily to the kind of “wrongdoing” involved in State Farm and BMW. We read State Farm and BMW both to recognize that nevertheless the States may specify some unusually reprehensible conduct for punitive damages that need not be proportioned to compensatory losses. The issue we face today is whether this case is governed by State Farm and BMW or perhaps instead by TXO where no ratio was used. We proceed to that analysis.
TXO involved intentional wrongdoing. Alliance, the owner of mineral rights on a 1,000 acre tract of land with significant oil and gas deposits, sued TXO for slander of title. Alliance had leased the oil and gas *724 rights to TXO for substantial payments over a period of years. Evidence showed that TXO sued Alliance to claim a cloud on title TXO knew to be baseless. TXO had already obtained a quit claim deed from the remote vendor whose former interest it claimed had clouded the interest of Alliance. It had also attempted to procure a false affidavit from a witness. TXO sought to force Alliance into renegotiating the lease to reduce royalty payments and thereby enhance its own financial interests. The suit resulted in a verdict awarding $19,000 in compensatory damages and $10 million in punitive damages to Alliance. TXO argued that the punitive damages were 526 times greater than actual losses and therefore facially excessive under the Fourteenth Amendment.
The Supreme Court first pointed out the great difficulty in comparing jury awards of punitive damages: “Because no two cases are truly identical, meaningful comparisons of such awards are difficult to make.” 509 U.S. at 457, 113 S.Ct. 2711. The Court emphasized a policy of refusing to draw a single test applicable to all awards. Instead it highlighted some of the factors on which the state court relied in affirming the award. In upholding the punitive damages, the critical factor was intentionally malicious conduct causing harm. The Supreme Court also accepted the State’s policy rationale that “punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant’s conduct as well as to the harm that actually has occurred.” [e.s.] 509 U.S. at 459-60, 113 S.Ct. 2711.
In TXO Justice Kennedy — who would later become the author of the majority opinion in State Farm — explained that he concurred with upholding the substantial punitive damages award even though it lacked proportionality with compensatory damages because:
“TXO acted with malice. This was not a case of negligence, strict liability, or respondeat superior. TXO was found to have committed, through its senior officers, the intentional tort of slander of title. The evidence at trial demonstrated that it acted ... ‘through a pattern and practice of fraud, trickery and deceit’ and employed ‘unsavory and malicious practices’ in the course of its business dealings with respondent. ‘[T]he record shows that this was not an isolated incident on TXO’s part — a mere excess of zeal by poorly supervised, low level employees — but rather part of a pattern and practice by TXO to defraud and coerce those in positions of unequal bargaining power.’ ” [e.s.]
509 U.S. at 468-69, 113 S.Ct. 2711. He agreed that:
“it was rational for the jury to place great weight on the evidence of TXO’s deliberate, wrongful conduct in determining that a substantial award was required in order to serve the goals of punishment and deterrence. I confess to feeling a certain degree of disquiet in affirming this award, but the record, when viewed as a whole, makes it probable that the jury’s verdict was motivated by a legitimate concern for punishing and deterring TXO, rather than by bias, passion, or prejudice. There was ample evidence of willful and malicious conduct by TXO in this case; the jury heard evidence concerning several prior lawsuits filed against TXO accusing it of similar misdeeds; and respondent’s attorneys informed the jury of TXO’s vast financial resources and argued that TXO would suffer only as a result of a large judgment.” [e.s.]
509 U.S. at 469, 113 S.Ct. 2711. Notably, when he became the author of the later majority opinion in State Farm, Justice Kennedy’s opinion did not recede from, *725 disapprove, or indicate in any way that TXO was no longer good law. In fact his State Farm opinion relied on TXO to restate the holding that no simple mathematical formula controls the issue of excessiveness for every case. 509 U.S. at 469, 113 S.Ct. 2711.
TXO appears specially apt for the wrongdoing in this case. In denying the motion to set aside the punitive damages, the trial judge described the evidence as basically showing that Lawnwood set out to destroy Dr. Sadow. Lawnwood engaged in a pattern and practice of slandering any doctor conflicting with hospital administration. Willfully and maliciously destroying the reputation of respected physicians and surgeons could reasonably be high on any list of reasons for severe punishment of wrongdoing. Indeed it could be thought worse than merely slandering title to property. Here too it was rational for the jury to find defendant had acted willfully and with express malice to harm the plaintiff. TXO supports considerable punishment without proportionality for conduct willfully and maliciously harming the plaintiff.
These federal authorities also make clear that state law and policy play a critical role in review of punitive damages, so we must consider Florida’s applicable statutory and decisional law relating to punitive damages and defamation. We point out that Florida has codified specific policies for punitive damages in civil litigation. By statute the general Florida rule now provides that “an award of punitive damages may not exceed the greater of ... three times the amount of compensatory damages ... or ... the sum of $500,-000.”[21] But in a significant exception to this limiting ratio, the statute specifies:
“Where the fact finder determines that at the time of injury the defendant had a specific intent to harm the claimant and determines that the defendant’s conduct did in fact harm the claimant, there shall be no cap on punitive damages.”[22] [e.s.]
Plainly this Florida statute eliminates mathematical proportionality with compensatory damages as a matter of state law and policy in cases of intentionally malicious harmful misconduct.[23]
Florida’s statutory law removing a ceiling on punitive damages for intentionally malicious harm suggests that any proportional ratio analysis required in negligence or business practices cases with only modest monetary or financial loss, would be incongruent when the claim involves, as here, the intentional infliction of malicious harm to an individual. Under Florida law applying to intentionally malicious harm, punitive damages is tied to unusually reprehensible misconduct, rather than some ratio relating to compensable losses.
This statute gives all who would consider such misconduct here clear warning that for intentional and malicious harm they can lawfully be punished to the extent of their personal ability to pay. It is apparent to us that the statute’s provision allowing punitive damages without proportionality for intentional, malicious harm satisfies any BMW and State Farm con *726 cern for fair notice. The Due Process Clause is thus satisfied by this statute.
We further perceive that this Florida statute would not apply to the conduct in State Farm and BMW involving commercial policy and trade practices, with purely economic consequences of only slight individual financial harm. The express disclaimer disavowing universal ratios in State Farm and BMW implies that the State Farm and BMW ratios are intended mainly for modestly reprehensible business or commercial trade practices causing individual damages limited in size, extent or amount. Declining to apply the State Farm and BMW ratios would not necessarily conflict if state law eliminates proportional ratios in cases of unusual reprehensibility. The punitive damages in this case thus require us to examine the reprehensibility of Lawnwood’s wrongdoing under Florida law.

1. Reprehensibility of Lawnwood’s Conduct

Under these federal cases, when punitive damages are substantial the first issue is the enormity[24] factor: whether the misconduct involves a high degree of culpability and blameworthiness. The Court has instructed State courts to consider three guideposts:
(1) the degree of reprehensibility of the defendant’s misconduct;
(2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and
(3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases, [e.s.]
State Farm, 538 U.S. at 418, 123 S.Ct. 1513; BMW, 517 U.S. at 575, 116 S.Ct. 1589. The first of these is explicitly the critical one and in this case appears to be dispositive.[25]
Reprehensible, more blameworthy and enormity are essential to an understanding of the Supreme Court’s meaning. Although much civil litigation involves misconduct, the reprehensibility required for harsh punitive damages entails a high degree of culpability. 517 U.S. at 580, 116 S.Ct. 1589. To meet the reprehensibility required for high punitive damages, the Court implied that (as in TXO) the misconduct should be intentional, perhaps be gravely deplorable, deserving of severe condemnation, even threatening basic interests of an individual beyond purely economic loss. Conduct deserving the harshest punitive damages would be odious. It would pass moral bounds, be wicked or *727 outrageous, and constitute a grave offense against right or decency. The disapproval expressed by state law should be avowedly strong and severe. We see that as the true meaning of the Court’s enormity factor.

a. Defamation under Florida law

The wrongdoing here is slander per se. In Miami Herald Publishing Company v. Ane, 458 So.2d 239, 241 (Fla.1984), the court pointed out that “Florida’s concern for individual reputation is reflected in article I, section 4, of the Florida Constitution.” Florida has thus singled out defamation per se for special rules in civil tort litigation. In Montgomery v. Knox, 23 Fla. 595, 3 So. 211, 217 (1887), the court held that statements defamatory per se are presumed harmful as a matter of law. In Abraham v. Baldwin, 52 Fla. 151, 42 So. 591, 592 (1906), the court held that with defamation per se “the law presumes malice in their utterance” making it unnecessary to prove express malice. In Layne v. Tribune Co., 108 Fla. 177, 146 So. 234, 239 (1933), the court pointed out that the law’s condemnation of defamation per se “has been affirmed from earliest times,” explaining that “the injurious character” of defamation per se “is a fact of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect.” [e.s.] 146 So. at 236. Layne went on to hold:
“Malice ... becomes therefore the gist of every actionable libel. Without malice, either express or implied by law, no tort could result from the publication of a defamatory statement concerning another, however untrue it might be. But the law always conclusively implied malice and damage when false and defamatory statements were deliberately published without excuse.” [e.s., c.o.]
146 So. at 238-39.
In Hartley & Parker v. Copeland, 51 So.2d 789 (Fla.1951), and Commander v. Pedersen, 116 Fla. 148, 156 So. 337 (1934), the court held that general damages are conclusively presumed to result from defamation per se and that “special damages need not be shown to sustain the action.” 156 So. at 341. In Miami Herald Publishing Company v. Brown, 66 So.2d 679, 680-81 (Fla.1953), the court made clear that general damages for defamation per se are “those which the law presumes must naturally, proximately, and necessarily result from the publication of the libelous matter. They arise by inference of law, and are not required to be proved by evidence.” Campbell v. Jacksonville Kennel Club, 66 So.2d 495 (Fla.1953), agreed that damages are presumed to result from defamation per se and need not be proved.
The singular protection afforded by Florida law to personal reputation in' actions for defamations per se is further seen by the fact that punitive damages may be the primary relief in a cause of action for defamation per se. Jones v. Greeley, 25 Fla. 629, 6 So. 448, 450 (1889), held that malice is an intrinsic part of actions for defamation per se in order that the jury may consider punitive damages. In Nodar v. Galbreath, 462 So.2d 803 (Fla.1984), the court added that the express malice for punitive damages under Florida law is present where the evidence shows that an intention to injure the plaintiff was the primary motive for statements defamatory per se.[26]
*728 The history of Florida law makes clear that that liability alone for intentionally malicious defamation per se will support substantial punishment in punitive damages. This unique aspect sets defamation per se apart from a comparable intentional tort — one that rightly could be considered its twin. Both fraud in the inducement and defamation per se depend on intentionally false statements meant to deceive and harm. But the critical distinction between them is that defamation harms persons and reputation, while fraud affects property rights and results only in financial loss. This difference plays an important role in a recent decision of this court, not cited by either party on appeal but referred to during the trial.[27]
In Morgan Stanley & Company v. Coleman (Parent) Holdings Inc., 955 So.2d 1124 (Fla. 4th DCA 2007), one party to a stock transaction sued the other party, claiming fraud in the inducement. A jury awarded both compensatory and punitive damages. On appeal, we held that the evidence supporting the compensatory damages was entirely insufficient and that consequently no compensatory loss had been proved. We rejected plaintiffs argument in support of punitive damages, however, that no compensatory damages were necessary to support an entitlement to punitive damages:
“It is fundamental that ‘[ajctual damages and the measure thereof are essential as a matter of law in establishing a claim of fraud. ’ ‘Damage is of the very essence of an action for fraud or deceit.’ Without proof of actual damage the fraud is not actionable. Thus, to prevail in an action for fraud, a plaintiff must prove its actual loss or injury from *729 acting in reliance on the false representation.
“Even if CPH established the fact of some unquantified damage ... a nominal damage award ... is not enough to justify a punitive damage award in a fraud case. Punitive damages for fraud cannot be based on nominal damages alone, [e.s., c.o.]
955 So.2d at 1132. In short, a claim for punitive damages from fraud in the inducement faded if no amount of compensatory loss resulting from the fraud was actually proved.
But when the claim is defamation per se, liability itself creates a conclusive legal presumption of loss or damage and is alone sufficient for the jury to consider punitive damages. Commander, 156 So. at 341; see also Bobenhausen v. Cassat Ave. Mobile Homes, 344 So.2d 279, 281 (Fla. 1st DCA 1977), cert. discharged, 363 So.2d 1065 (Fla.1978) (malice is presumed as a matter of law from the publication of such words). Therefore a finding of liability for slander per se, coupled with an express finding that the slander was intended to injure plaintiff and did in fact cause injuiy, authorizes the jury to consider and assess punitive damages without any finding of an amount of compensatory damages. See Lundquist v. Alewine, 397 So.2d 1148, 1150 (Fla. 5th DCA 1981) (where defamation is actionable per se, punitive damages may be awarded even though the amount of actual damages is neither found nor shown); Saunders Hardware Five and Ten v. Low, 307 So.2d 893 (Fla. 3d DCA 1975), cert. denied, 330 So.2d 21 (Fla.1976) (same); Bobenhausen, 344 So.2d at 281 (in libel per se even though no special damages proven, plaintiff may still recover punitive damages upon a showing that publication was made for malice or ill-will toward him); see also Nodar, 462 So.2d 803 (express malice under Florida common law is present where primary motive for defamation per se is shown to be intent to injure plaintiff); Jones v. Greeley, 25 Fla. 629, 6 So. 448, 450 (1889) (same).
To sum up, Florida’s unusually high protection of personal reputation derives from the common consent of humankind and has ancient roots. It is highly valued by civilized people. Our state constitution and common law powerfully support it. This is a value as old as the Pentateuch and the Book of Exodus, and its command as clear as the Decalogue: “Thou shall not bear false witness against thy neighbor.” The personal interest in one’s own good name and reputation surpasses economics, business practices or money. It is a fundamental part of personhood, of individual standing and one’s sense of worth. In short, the wrongdoing underlying the punitive damages in this case has Florida law’s most severe condemnation, its highest blameworthiness, its most deserving culpability.[28] For slander per se, reprehensibility is at its highest.

*730
b. Comparison of economic injuries with defamation

In contrast to that vital personal interest here, the conduct in State Farm and BMW seems almost trivial. The minor economic injuries in those cases pale into insignificance next to the calumnies proven here. BMW is simpler, while the details of the State Farm case are extensive, but their differences become vivid when examined.
BMW’s conduct is nearly a trifle. The claim lay in a manufacturer failing to tell a consumer about minor paint damage to a new automobile during transit to the dealer, in which acid rain had tarnished the finish. The $600 cost of repainting represented 1.5% of the sale price. As a matter of policy, BMW did not disclose such pre-sale repairs if less than 3% of the MSRP. Some may think the policy wrong; others may be left searching for the harm if the manufacturer corrects the blemish before delivery.
BMW’s buyer sued for fraud, praying for $555,000, including punitive damages. His evidence was the repainting reduced the value of a new $40,000 car by 10%. The jury found $4,000 in compensatory damages and assessed $4 million in punitive damages for the nondisclosure, finding “gross oppressive and malicious” fraud. The finding was largely based on BMW’s nationwide policy outside the State of Alabama and case at hand. In post trial motions BMW showed the policy was lawful in 25 of the States. The Alabama supreme court reduced the punitive damages to $2 million and thus allowed the judgment to stand.
The Supreme Court accepted the rationale that BMW suppressed a material fact state law obligated it to disclose. But the Court stressed that reasonable people could disagree as to whether the nondisclosure policy was even wrong. If reasonable people could disagree whether conduct should be deemed improper, its disapproval quotient must be very low and reprehensibility small by any measure. Yet, even as reduced by the state court, the Supreme Court found the punitive damages “grossly excessive” for the conduct in question. And in spite of the fact that the business practice may have been deemed actionable for state tort liability, the Court held it lacked the high degree of culpability needed to warrant more than a modest amount of punitive damages. 517 U.S. at 580, 116 S.Ct. 1589.
State Farm concerned a liability insurance carrier refusing to settle a wrongful death claim against its insured during extensive litigation, with the insured suffering a money judgment in excess of the policy limits. During the litigation the carrier insisted on disputing liability for the accident even though the witnesses placed the blame on the insured in attempting to pass other vehicles unsafely, causing the collision. The carrier declined offers to settle within policy limits, meanwhile assuring the insured that their assets were safe from judgment. The carrier took the case to trial and suffered a judgment well above policy limits.
When the carrier refused supersedeas, the insured handled the appeal and entered into a settlement with the plaintiff. In time, the carrier paid the entire excess judgment and expenses. Nevertheless, the insured sued the carrier for bad faith, fraud and infliction of emotional distress. Over the carrier’s objection, the trial court *731 allowed evidence of its practice over two decades of minimizing payouts in claims handling in other states. The jury awarded actual damages of $2.6 million and punitive damages of $145 million. These were reduced to $1 million and $25 million respectively.
After applying the BMW standards, State Farm, demolished any reprehensibility quotient with the dismissive observation that its conduct merely “merit[ed] no praise.” 538 U.S. at 419, 123 S.Ct. 1513. If the worst thing one can say about conduct is only that it merits no praise, is it even blameworthy? The Court held that “a more modest punishment” would have satisfied any legitimate state objectives in punishment for the carrier’s conduct. 538 U.S. at 419-20, 123 S.Ct. 1513. Here again, the state court punishment was largely based on conduct in other states in other cases, some of which was lawful but none of which harmed the plaintiff.[29]
Obviously whatever trace of reprehensibility for failure to settle a claim within policy limits was left to be squeezed out of the carrier’s conduct is minor by any objective culpability standard. Indeed the carrier’s conduct could reasonably be deemed as lacking any culpability at all, for the insured had already been made whole by the ultimate payment of the entire judgment above policy limits and expenses.[30]
The conduct here is in stark contrast. The jury obviously found Lawnwood’s offense despicable. To repeat, the trial judge described the evidence as essentially showing that Lawnwood set out to destroy Dr. Sadow’s career in the community. The jury’s finding of a specific intent to harm Dr. Sadow, together with its finding of actual harm, is the very incarnation of both express and actual malice. It was a purposeful act of malevolent destruction of the reputation of one of its surgeons, done repeatedly as a matter of policy.
A reasonable jury could conclude that repeatedly defaming the skill and proficiency of a practicing surgeon was likely to have significant and long-lasting public and professional consequences.[31] It could ra *732 tionally have equated the slanders to feathers loosed into the wind, with no one ever knowing where they all landed or whom they touched. The effects could be seen as insidious and unknowable.[32] The jury could deem this the very worst institutional wrongdoing conceivable — wicked enough for considerable punishment with a strong corrective impact on the defamer. Hence the applicable rule of decision for this case is really from TXO: extraordinary wrongdoing justifies extraordinary civil punishment without limiting ratios.

2. Proportionality

The United States Supreme Court has itself recognized a “compelling need for judicial redress of libelous utterances” equal to the compelling interests of the First Amendment.[33] The proportionality analysis in the federal decisions requires us to insure only that the reprehensibility of the wrongdoing — not the amount of actual harm or loss — is equivalent to the punishment. As we have also seen in Florida law, when a claim involves harm resulting from the intentionally malicious destruction of reputation, reprehensibility is not a function of any dollar loss involved.[34]
Nothing in BMW and State Farm hints how an arithmetical ratio used in cases of purely economic misconduct would function against this kind of premeditated calumny and the considerable harm the general consent of humankind recognizes is caused by it.[35] Indeed this may be precisely the case the Court had in mind in allowing exceptions to the ratio: “low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages.” BMW, 517 U.S. at 582-83, 116 S.Ct. 1589.
Given the obvious enormity of the offense, the jury’s role was to assess punishment powerful enough to be felt and deter further actions of the kind by one shown to be a repeat offender.[36] It was required to *733 fix a sum of money large enough to equal the reprehensibility of the wrongdoing and significant enough to punish and deter this particular actor. But this actor’s assets exceed its liabilities by $100,000,000. A fine of $5,000,000 is thus only 5% of its net worth. Such a small part — if a roll of quarters symbolized net worth, just two of its coins — might rationally be thought by some as inadequate for a malicious defamer of such resources.[37]
State Farm and BMW hold damages reasonable when they “vindicate the State’s legitimate interests in punishment and deterrence.” 517 U.S. at 568, 116 S.Ct. 1589. The Due Process Clause’s concern for excessiveness is measured against the peculiar interests involved in the case. When the tortfeasor has a $100,000,000 pile of unencumbered wealth, nothing in federal or Florida law[38] suggests that 5% of that pile is arbitrary or excessive for maliciously and intentionally slandering a respected surgeon to destroy his professional reputation. The sum of $5,000,000 is legally equal to the reprehensibility of the intentionally malicious harm inflicted. That is the true application of federal proportionality in this punitive damages case. We conclude the jury’s verdict was not disproportionate under federal law in the intended sense.

D. Jury Instruction and Verdict Form

In closing we find we must disclose an error in the jury instruction. Although the instruction and verdict form used in this case did not affect the outcome or our analysis on appellate review, we point out that the instruction may have resulted in the jury’s failure to find even nominal compensatory damages for the slander per se.[39]
*734 To repeat, Commander v. Pedersen, 116 Fla. 148, 156 So. 337, 341 (1934), held that “general damages ... are conclusively presumed to result ” in cases of defamation per se. [e.s.] See also Campbell v. Jacksonville Kennel Club, 66 So.2d 495 (Fla.1953) (words actionable per se import damage and general damages are presumed to result and need not be proved); Wagner Nugent Johnson Roth Romano Erikson & Kupfer P.A. v. Flanagan, 629 So.2d 113, 116 n. 4 (Fla.1994) (quoting Restatement (Seoond) of Torts § 558: “one who is liable for a slander actionable per se ... ' is liable for at least nominal damages.”); Myers v. Jim Russo Prison Ministries Inc., 3 So.3d 411 (Fla. 2d DCA 2009) (same); 19A Fla. Jur.2d Defamation and Privacy, § 133. If the jury finds defendant liable for slander per se, it must be instructed that nominal damages are deemed established as a matter of law. It is error to instruct instead that nominal damages may be awarded if you wish to do so. Dr. Sadow’s trial counsel raised this legal inconsistency in the verdict during post verdict proceedings but ultimately decided not to press the matter. Nonetheless on review we have presumed that slanders per se caused at least nominal damages.

E. Conclusion

After giving the exacting appellate review of this case required under the de novo standard of State Farm and BMW, we conclude that the amount of punitive damages assessed conforms to applicable law and is neither excessive nor arbitrary so as to exceed federal Constitutional norms. Because the issue presented is of great public importance as to the imposition and assessment of punitive damages under Florida law for cases involving intentionally malicious, harmful defamation per se under TXO, BMW and State Farm, we certify to the Florida Supreme Court the following question:

Are punitive damages of $5,000,000 arbitrary or excessive under the Federal Constitution where the jury awarded no compensation beyond presumed nominal damages but found that defendant intentionally and maliciously harmed plaintiff by slanders per se?

Affirmed.

CIKLIN, J. and LEBAN, MARK KING, Associate Judge, concur.

. On appellate review the verdict in Dr. Sa-dow’s favor compels us to accept his version of disputed issues of fact. See TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 447, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) (jury verdict in favor of one party makes it appropriate to accept that party's version of disputed issues of fact); Helman v. Seaboard Coast Line R.R. Co., 349 So.2d 1187 (Fla.1977) (not function of appellate court to reevaluate evidence and substitute its judgment for jury).

. This surgery is described as "high risk” or "open heart” surgery. Typically it involves valve replacements, repairs with or without coronary bypass grafts, left ventricular aneurysm repairs, and thoracic aortic dissections and aneurysms.

. § 395.0193, Fla. Stat. (1998) (each licensed facility shall provide for peer review of physicians and shall develop written, binding procedures by which such peer review shall be conducted).

. The Medical Staff Bylaws provide that: "The Medical Executive Committee shall consist of the officers of the Medical Staff, the Chairman of the Departments of Medicine and Surgery, four (4) members elected at large from the Active Staff, and the Past President of the Medical Staff."

.Wiggins v. Sadow, 925 So.2d 1152 (Fla. 4th DCA 2006) (jury verdict in favor of surgeon in medical malpractice action not against manifest weight of evidence requiring new trial; case simply presented disputed issues of fact resolved by jury; surgeon lacerated patient's renal vein during surgery because of patient's anatomical anomaly found in just 1-2% of *715 population; defense expert testified surgeon met standard of care because many radiologists would not have recognized anomaly from pre-surgery CT scan; not unreasonable that surgeon failed to recognize it during surgery; plaintiff's expert conceded he once failed to recognize same anomaly before surgery).

. It should be noted that Lawnwood ultimately approved the Downing group for exclusive privileges in CVS before its facility was finally opened.

. See Lloyd v. Lawnwood Med. Ctr., Inc., 2000 WL 309305 (Fla. 19th Cir. Feb. 16, 2000).

. See Lawnwood Med. Ctr., Inc. v. Lloyd, 773 So.2d 114 (Fla. 4th DCA 2000).

.Conspicuously, the evidence does not show Pentz correcting or stopping Dunwoody from making these comments, but apparently remaining silent while Dunwoody spoke about Sadow and the "problem doctors”.

. See Fla. Std. Jury Instr. (Civ.) MI 4.4 g.(l) and PD 1. Specifically, in phase 1 the Jury was instructed as follows:
"Punitive damages are warranted if you find, by clear and convincing evidence, that Lawnwood's primary purpose in making the statement was to indulge ill will and hostility and intent to harm Dr. Sa-dow. If you find for Dr. Sadow and against Lawnwood, and you also find that clear and convincing evidence shows that Robert Dunwoody was personally guilty of an intentional misconduct which was a substantial cause of loss, injury or damage to Dr. Sadow, and that such conduct would warrant an award of punitive damages against him, in accordance with the standards that I have mentioned, then in your discretion, you may determine that punitive damages are warranted against Lawnwood. Intentional misconduct means that Robert Dunwoody had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to Dr. Sadow would result, and despite that knowledge, intentionally pursue that course of conduct resulting in injury or damage. Now, clear and convincing evidence differs from the greater weight of the evidence in that it is more compelling and persuasive. Greater weight of the evidence means the more persuasive and convincing force and effect of the entire evidence in the case. In contrast, clear and convincing evidence is evidence that is precise, lacking in confusion, and of such weight that it produces a firm belief or conviction without hesitation about the matter in issue.”
In phase 2 it was instructed:
"Ladies and gentlemen of the jury, you will now determine the amount of punitive damages, if any, to be assessed as punishment and as a deterrent to others. This amount would be in addition to the compensatory damages you have previously awarded. In making this determination, you should consider the following: The nature, and degree of misconduct, and the related circumstances including the following, whether the wrongful conduct was motivated solely by unreasonable financial gain; whether the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by Lawnwood; whether, at the time of the loss, injury or damage to Dr. Sadow, Lawnwood had a specific intent to harm Dr. Sadow and the conduct of Lawn-wood did, in fact, harm Dr. Sadow, and Lawnwood's financial resources. However, you may not award an amount that would financially destroy Lawnwood. You may, in your discretion, decline to assess punitive damages. Your verdict on the issues raised by the punitive damages claim of Dr. Sa-dow against Lawnwood must be based on the evidence that has been received during the trial of the first phase of this case, and on the evidence that has been received in *721 these proceedings, and on the law which I have instructed you.”

. § 395.0191(7), Fla. Stat. (2009) ("There shall be no monetary liability on the part of, and no cause of action for injunctive relief or damages shall arise against, any licensed facility, its governing board or governing board members, medical staff, or disciplinary board or against its agents, investigators, witnesses, or employees, or against any other person, for any action arising out of or related to carrying out the provisions of this section, absent intentional fraud”).

. Arnold, Matheny & Eagan P.A. v. First Am. Holdings Inc., 982 So.2d 628, 633 (Fla.2008) (statutes must be construed by looking primarily at the statutory language; if the language is clear and unambiguous, then the court has no further reason to apply the rules of statutory construction).

. McLaughlin v. State, 721 So.2d 1170, 1172 (Fla.1998); St. Petersburg Bank & Trust Co. v. Hamm, 414 So.2d 1071, 1073 (Fla.1982).

. Golf Channel v. Jenkins, 752 So.2d 561, 564 (Fla.2000); Moonlit Waters Apts., Inc. v. Cauley, 666 So.2d 898, 900 (Fla.1996).

. Forsythe v. Longboat Key Beach Erosion Control Dist., 604 So.2d 452, 455 (Fla.1992).

. State v. Goode, 830 So.2d 817, 824 (Fla.2002).

. See also Fla. Dept. of Bus. and Prof'l Regulation, Div. of Pari-Mutuel Wagering v. Inv. Corp. of Palm Beach, 747 So.2d 374, 382-83 (Fla.1999) (same quote); Hill v. State, 688 So.2d 901, 908 (Fla.1996) (same quote).

. For this reason, we disagree with Lawn-wood’s able appellate counsel that Feldman v. *722 Glucroft, 522 So.2d 798 (Fla.1988) and Noble v. Martin Memorial Hosp. Ass'n Inc., 710 So.2d 567 (Fla. 4th DCA 1997), support immunity in this case. In Feldman the medical review board was obviously acting within the scope of its authorized function relating to the standard of care. Noble involved a denial of all privileges, in contrast to the case we confront today involving a simple breach of contract between the hospital and one of its staff surgeons. See also Fla. Dept. of Envtl. Protection v. ContractPoint Florida Parks, LLC, 986 So.2d 1260 (Fla.2008) (broad meaning of immunity in two provisions limited by provisions in another).

. See Hosp. Corp. of Lake Worth v. Romaguera, 511 So.2d 559, 560 (Fla. 4th DCA 1986) (contract between hospital and physician affected by modification of bylaws).

. See Cooper Indus., Inc. v. Leatherman Tool Group Inc., 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); Engle, 945 So.2d at 1263.

. § 768.73(l)(a), Fla. Stat. (2009). See also § 768.73(4), Fla. Stat. (2009) (jury may not be instructed as to these provisions). In oral argument Lawnwood argued that the excess above $500,000 should be remitted.

. § 768.73(l)(c), Fla. Stat. (2009).

.See Owens-Corning Fiberglas Corp. v. Ballard, 749 So.2d 483, 489 n. 9 (Fla.1999) (“The Legislature has placed no cap on punitive damages awards where the defendant specifically intended to harm the plaintiff and the defendant’s conduct did in fact harm the plaintiff”).

. See American Heritage Dict. (Electronic Edition) (search term enonnity: "The quality of passing all moral bounds; excessive wickedness or outrageousness. A monstrous offense or evil; an outrage”); Merriam-Webster Unabridged Dict (CD-ROM ed.) (search term enormity: the quality or state of exceeding a measure or rule, or of being immoderate, monstrous, or outrageous; as 'the enormity of the offense'; a grave offense against order, right, or decency”). Modern usage of the term enormity misuses it to describe merely large in physical size. But the BMW sense in which it is used obviously refers to the traditional meaning of the word.

. The reprehensibility of defendant’s misconduct in a claim for punitive damages is by far the most significant factor. BMW said:
"[punitive] damages imposed on a defendant should reflect 'the enonnity of his offense.' This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that 'nonviolent crimes are less serious than crimes marked by violence or the threat of violence.’ Similarly, ‘trickery and deceit, are more reprehensible than negligence.” [e.s., c.o.]
517 U.S. at 575-76, 116 S.Ct. 1589; State Farm, 538 U.S. at 419, 123 S.Ct. 1513.

. These state cases have consistently held that proof of liability for defamation per se— especially when based as here on a specific finding that the defamer acted with specific intent to injure the plaintiff — is alone sufficient for the jury to consider punitive damages and that plaintiff need not show any proof of monetary loss. Bobenhausen v. Cas *728 sat Ave. Mobile Homes Inc., 344 So.2d 279 (Fla. 1st DCA 1977), the court said:
"We reject the ... argument that it is necessary before a plaintiff recover punitive damages that the amount of pecuniary loss be determined to a reasonable certainty. The general rule is that in libel actions, even though no special damages may have been proven, a plaintiff may still recover punitive damages upon a showing that the publication was made for malice or ill-will toward him." [e.s., c.o.]
344 So.2d at 282. To the same effect is Saunders Hardware Five and Ten, Inc. v. Low, 307 So.2d 893 (Fla. 3d DCA 1974), where the court said:
"we hereby adopt the general rule that where the defamation complained of is actionable per se, punitive damages may be awarded even though the amount of actual damages is neither found nor shown, for in such a case the requirement of a showing of actual damages as a basis of an award of exemplary damages is satisfied by the presumption of injury which arises from a showing of libel or slander that is actionable per se.”
307 So.2d at 894. In Matthews v. Deland State Bank, 334 So.2d 164 (Fla. 1st DCA 1976), the court followed the decision in Saunders Hardware, holding that "[t]he instruction given by the trial court on actual malice is defective in that it does not fully inform the jury that the malice necessary for the award of punitive damages can be deduced from the publication itself” and that the trial court erred in instructing the jury that punitive damages could not be awarded unless an award of compensatory damages was made. 334 So.2d at 166. The Eleventh Circuit has so recognized Florida law on punitive damages in actions for defamation per se as set forth above. Hunt v. Liberty Lobby, 720 F.2d 631 (11th Cir.1983) (verdict for punitive damages can be returned only if jury finds defendant acted with type of ill will identified in Matthews). There are no conflicting decisions by any Florida appellate court.

. At one point Lawnwood sought to convince the trial judge that even in cases involving slander per se plaintiff had to prove a specific monetary amount of injury to have the jury consider punitive damages. Ultimately, however, the hospital withdrew the argument and recognized the many Florida cases holding to the contrary. In this appeal, Lawnwood is consistent with its ultimate position in the trial court, and has not renewed the argument.

. Florida is not alone in this regard. See Note, Punitive Damages and Libel Law, 98 Harv. L. Rev. 847, 854 n.43 (1985) ("Some federal judges and state courts have expressly recognized that the standard for punitive damages in libel suits differs from the one applied in other tort actions, [e.s.] ... Because most courts will grant punitive damages upon a showing of actual malice, such damages have been assessed even in cases in which actual damages were absent or merely nominal. See, e.g., Goldwater v. Ginzburg, 414 F.2d 324, 340-41 (2d Cir.1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970) (upholding award of $1 in actual damages and awards of $25,000 and $50,000 in punitive damages); ... Newson v. Henry, 443 So.2d 817, 824 (Miss.1983) (it is 'not necessary to award actual damages as a prerequisite to awarding punitive damage[s]'); Snodgrass v. Headco Indus., 640 S.W.2d 147, 157 (Mo.Ct.App.1982) (upholding award of $1 in *730 actual damages and $75,000 in punitive damages); Newspaper Publishing Corp. v. Burke, 216 Va. 800, 805, 224 S.E.2d 132, 136 (1976) (remanding, on the basis of a faulty actual malice instruction, a case in which the jury had awarded no compensatory damages and $10,000 in punitive damages)).”

. As the Court put it, "defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business.” 538 U.S. at 423, 123 S.Ct. 1513. The Court held:
"The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20-year period. In this case, because the Campbells have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.”
538 U.S. at 424, 123 S.Ct. 1513.

. In BMW where the conduct was only "purely economic in nature,” 517 U.S. at 576, 116 S.Ct. 1589, the Court found such conduct unworthy of anything more than token punishment beyond compensatory damages. Id. State Farm made the same distinction: "[w]e have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic....” State Farm made clear that if the harm was only economic, reprehensibility would turn on whether the tortious conduct:
"evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident."
538 U.S. at 419, 123 S.Ct. 1513.

.Jurors could fairly find that when a hospital speaks about the competency of a surgeon it speaks ex cathedra. As the pre-eminent institution of health care within the community, a jury could logically infer, a hospital's perceptions of the competency of its professionals should be taken as powerfully authoritative.

. TXO specifically approved consideration of harm "likely to result” as a factor supporting substantial punitive damages for malicious harm. 509 U.S. at 459-60, 113 S.Ct. 2711.

. See Gertz v. Robert Welch Inc., 418 U.S. 323, 347, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (so long as liability is based on fault States may define appropriate standard of liability for a publisher of defamatory falsehood injurious to a private individual; award of punitive damages must be based on actual malice); Bose Corp. v. Consumers of United States Inc., 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502, (1984) (constitutional rule of independent review of determination of actual malice in defamation action recognized trial judge's opportunity to observe demeanor of witnesses). There is no question that the jury's finding of clear and convincing evidence of intentional falsity, harmful intent, and actual harm in this case satisfies Gertz.

. § 768.73(1)(c), Fla. Stat. (2009).

. It is a significant harm we ourselves have previously recognized in a case of strikingly similar circumstances. Substantial misconduct in the defamation of a physician was the subject in Zambrano v. Devanesan, 484 So.2d 603 (Fla. 4th DCA 1986), where in upholding an equally substantial award of punitive damages we said that "punitive damages are to be measured 'by the enormity of the offense, entirely aside from the measure of compensation of the injured plaintiff.’ " 484 So.2d at 609. This case is identical to Zambrano.

.See Owens-Corning Fiberglas Corp. v. Ballard, 749 So.2d 483, 486 (Fla.1999) (under Florida law purpose of punitive damages is not to further compensate plaintiff but to punish defendant for wrongful conduct and deter similar misconduct by it and other actors in the future); Ingram v. Pettit, 340 So.2d 922, 923-24 (Fla.1976) (long established in Florida law that availability of punitive damages reserved to cases where private injuries partake of public wrongs, including intentional infliction of harm); Zuckennan v. Robinson, 846 So.2d 1257, 1258 (Fla. 4th DCA 2003) (punitive damages are premised on the enormity of the act resulting in the injury to the plaintiff).

. In response to Lawnwood's argument that it could not have predicted the size of the punitive damages assessed by the jury, Dr. Sadow calls our attention to a few cases involving defamation claims in the health care setting. See Reis v. Cedars Med. Ctr., 1995 WL 865054 (Fla. 11th Cir. Ct. Nov. 1995) ($3,334,857 verdict for defamation); Prof'l Med. Educ., Inc. v. Palm Beach Co. Health Care Dist., 2007 WL 2197752 (Fla. 15th Cir. Ct. July 3, 2007) ($692,400 verdict for defamation, tortious interference with business relations and civil conspiracy); Scheer v. Entel Radiological Assoc., 1989 WL 527221 (Fla. 6th Cir. Ct. Dec. 1989) ($1,856,927 verdict for plaintiff on defamation and breach of contract counts). To those, we take special note of our own decision in Zambrano v. Devanesan, 484 So.2d 603 (Fla. 4th DCA 1986) (affirming verdict of $700,000 in punitive damages for defamatory per se falsehood of physician by another staff physician). All of these cases arose in south Florida. All of them involve comparable parties and comparable amounts, and surface similarities with this case. None of them raise any concern suggesting exces-siveness in the present case.

. Cooper Indus., Inc. v. Leatherman Tool Group Inc., 532 U.S. 424, 432, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001); Engle, 945 So.2d at 1262.

.The court followed Standard Jury Instruction MI 4.4, saying:
If you find for Dr. Sadow, you shall consider the following elements of damage: any injury to reputation or health and any shame, humiliation, mental anguish, and hurt feelings experienced in the past or to be experienced in the future.... If you find for Dr. Sadow, but find that no damage has been proved, you may award nominal damages. [e.s.]
Then the verdict form specified:
Question 6: What is the amount of compensatory damages, if any, that Dr. Sadow has sustained as a result of slander by Lawn-wood for injury to Dr. Sadow's reputation, health, and shame, humiliation, mental anguish and hurt feelings?
A. experienced in the past: $_____
B. to be experienced in the future: $_____
C. present value of future damages. $_____
D. total: $_____
Question 7: If you find that Dr. Sadow has not proven any amount of compensatory damages, then do you wish to award nominal damages? And if so, in what amount? *734 (if you elect not to assess nominal damages, then enter 0). [e.s.]
$_____
We have emphasized the parts we find troublesome.