MAY, J.
 

 In a repeat performance, the defendant Elena Whitby a/k/a Jennifer Ross, and three corporate defendants who owned and operated the WRMF-FM radio station,
 
 [1]
 
 appeal a final judgment entered in favor of the plaintiff Infinity Radio, Inc., who owns and operates the WEAT-FM radio station.
 
 [2]
 
 The defendants challenge the enforceability of a non-compete provision, the sufficiency of the evidence on the claim for lost profits, and the propriety of injunctive relief and punitive damages awarded. For the reasons that follow, we reverse.
 

 Whitby entered into an employment agreement with OmniAmerica Group in 1995 and later entered into a 1999 amendment that incorporated the terms of the original agreement. The original agreement provided a five-year term and gave WEAT two options to renew for five years each, with a right of first refusal. The 1995 agreement contained a non-compete provision, which prohibited Whitby from appearing on radio or television and from working for any competing business within 125 miles of WEAT for 12 months. It also contained an exclusivity provision, preventing Whitby from discussing or entering into any agreement with any other entity concerning her present or future services during the term of her employment.
 

 In January 2000, the plaintiff exercised its option to renew the agreement. Once exercised, the agreement provided for Whitby to negotiate in good faith exclusively with WEAT for ninety (90) days. On September 21, 2000, four days prior to the agreement’s expiration, a corporate defendant (James Crystal Holdings) executed a three-year employment agreement with Whitby, in which she agreed to broadcast on the WRMF morning show. On September 25, 2000, Whitby ceased her employment with WEAT. Later that day, she began broadcasting on WRMF.
 

 The plaintiff sued Whitby and the corporate defendants seeking injunctive relief.
 
 [3]
 
 
 *72
 
 The plaintiff also filed an emergency motion for temporary injunction. The trial court denied the temporary injunction; we reversed.
 
 Infinity Radio Inc. v. Whitby,
 
 780 So.2d 248 (Fla. 4th DCA 2001),
 
 rev. denied,
 
 796 So.2d 539 (Fla.2001). Upon remand, the trial court entered the temporary injunction without prejudice for consideration of issues concerning the reasonable scope of the injunction.
 
 [4]
 

 After a jury trial, the trial court entered final judgment against each defendant in the amount of $575,000, severally, for a total of $2.3 million in compensatory damages. The judgment also assessed punitive damages of $13.2 million against James Crystal Licenses. On appeal, we again reversed and remanded for a new trial.
 
 Whitby v. Infinity Radio, Inc. (Whitby I),
 
 951 So.2d 890 (Fla. 4th DCA 2007).
 
 [5]
 

 In the second jury trial, the factual background testimony remained the same, but the damages testimony changed. Instead of using an expert witness, the plaintiff relied on its employees and a recently compiled summary of lost accounts.
 

 Lee Strasser, the plaintiffs former general manager, testified that Whitby was the spokesperson for Borton Volvo, Roth-child Eye Institute, Culligan Water, and Palm Beach Zoo. These accounts were either cancelled or their advertising greatly reduced after Whitby departed. However, he had not spoken directly with these advertisers as to why this had occurred. He also testified that other factors could also affect the station’s advertising revenue namely: a change in a customer’s advertising budget, the radio station’s sales department, sales manager, ratings, image in the marketplace, community involvement, and rates.
 

 WEAT account executives, Judy Larson and Jody Goldstein, and the plaintiffs regional sales manager, Janice Banken, testified about their respective accounts. Larson testified that Whitby performed live testimonials for Rothchild and the Palm Beach Princess. According to her, the accounts were “a direct result of Ms. Whit-by’s presence at WEAT.” She testified that Rothchild substantially reduced its advertising contract on September 25, 2000, and the Princess did not advertise on WEAT because they went to WRMF. The Princess returned to WEAT in July 2001.
 

 Goldstein testified that TLC Laser Eye Institute’s marketing director was interested in placing advertisements with WEAT because of Whitby. She had no doubt that TLC cancelled when Whitby left. TLC cancelled all of its contracts in October 2000.
 

 Banken testified that “Cingular didn’t know Jennifer Ross from Adam” and she “dealt with the ad agency, not Cingular directly.” She lost the account when Cin-gular/Bellsouth switched from a regional to a national advertising agency.
 

 Julie Caracciola, the plaintiffs market controller, used an accounts receivable analysis report to prepare the Summary of WHEAT Top 7 Lost Accounts. The summary was a “compilation of data for the seven accounts listed that indicates all billing, payments, and expenses, sales com
 
 *73
 
 mission and talent expenses relative to each of these accounts by month from October of 1999” to September 2001. She did not subtract any general overhead expenses because they were fixed. She admitted that she had prepared the revised version of the document that was submitted into evidence only a few weeks before trial.
 

 The plaintiffs general sales manager, Jeffrey Greenwald, testified that he wrote a memorandum on August 3, 2001, entitled “Lost Business Due to Jennifer Ross,” in which he indicated that Rothchild immediately pulled its advertising, and Volvo did not spend a dime in advertising after Whit-by left. He admitted, however, that the advertisers were the only ones who could truly answer whether the ads were can-celled because of Whitby’s departure.
 
 [6]
 

 In closing, the plaintiff requested just over $300,000 in lost profits. The jury awarded the plaintiff $126,511.48 in compensatory damages against all defendants, exclusive of interest. In a bifurcated trial, the jury then awarded $2.3 million in punitive damages against each of the three corporate defendants. The trial court entered a final judgment. From this judgment, the defendants appeal.
 

 The defendants raise numerous reasons why the compensatory damages award cannot be sustained.
 
 [7]
 
 The corporate defendants further argue that the plaintiff elected its remedy when it obtained the temporary injunction. We are able to resolve this appeal by analyzing the evidence, or lack thereof, in support of damages.
 

 We have
 
 de novo
 
 review of the court’s failure to direct a verdict on damages.
 
 RKR Motors, Inc. v. Associated Unif. Rental & Linen Supply, Inc.,
 
 995 So.2d 588, 591-92 (Fla. 3d DCA 2008),
 
 rev. denied,
 
 8 So.3d 1133 (Fla.2009).
 

 In
 
 Whitby I,
 
 we stressed that
 

 [wjhen a party seeks lost future profits based upon a breach of contract or other wrong, the party must prove that the lost profits were a direct result of the defendant’s actions and that the amount of the lost profits can be established with reasonable certainty. Difficulty in proving damages or uncertainty as to the amount will not prevent recovery as long as it is clear that substantial (rather than merely nominal) damages were suffered as a result of the wrong, and the competent evidence is sufficient to satisfy the mind of a prudent, impartial person as to the amount. However, an award of lost profits cannot be based on mere speculation or conjecture.
 

 951 So.2d at 898 (emphasis added) (quoting
 
 Forest’s Mens Shop v. Schmidt,
 
 536 So.2d 334, 336 (Fla. 4th DCA 1988)).
 

 We reversed the original compensatory damages award because the ex
 
 *74
 
 pert’s methodology in calculating damages was too speculative. In doing so, we emphasized that “there must be substantial competent evidence directly linking those damages to Appellants’ activities during the seven months between Whitby’s departure from WEAT and the trial court’s entry of the temporary injunction.”
 
 Id.
 
 at 900. We also advised the plaintiff to account for other variables:
 

 (1) the fact that Whitby’s longtime co-host, Kevin Kitchens, died suddenly on February 3, 1999, (2) the competence and performance of Joe Martelle, Whit-by’s replacement, (3) the introduction of a new morning team at WOLL (another morning show competitor), (4) whether advertisers decreased their expenditures as a result of Whitby going to WRMF and transferred their advertising to WRMF, and (5) ranking reports showing that both WRMF and WEAT declined in audience share after Whitby left AVE AT and joined WRMF, and that another station, AVKGR, won the number one rated position in the market by 2003 and 2004.
 

 Id.
 
 at 898. We stressed the importance of considering the impact of these external variables. And yet, we find those factors conspicuously absent from the damages testimony in the second trial.
 

 The plaintiffs attempt to link its lost advertising to AVhitby’s breach of the non-compete provision and the corporate defendants’ wrongdoing consisted of nothing more than hearsay statements from its account executives. No one was able to properly link WEAT’s damages with the defendants’ actions. This void leads to but one conclusion: the judgment must be reversed.
 

 In this trial, the plaintiff relied heavily on the summary. While the plaintiff introduced evidence of the loss or reduction in receivables after Whitby departed, there was no testimony that the loss was due to Whitby’s violation of the non-compete provision or the corporate defendants’ affirmative steps to secure Whitby for WRMF. This could have been achieved by demonstrating that those advertisers increased their advertising at WRMF because she broadcasted within the one-year prohibition. It could have also been achieved by having the seven advertisers testify that they followed Whitby to WRMF because she now broadcasted on that station.
 

 The reduction in advertising revenue alone was insufficient to directly link her violation of the non-compete provision to the lost revenue. These advertisers may very well have stopped advertising on WEAT when AVhitby left, regardless of whether she violated the non-compete provision. Her contract expired, and she was entitled to leave. She simply was not entitled to broadcast for another year within the mileage radius defined by the court.
 

 There was no proof that AVhitby or the corporate defendants enticed these advertisers to switch to WRMF or that the reduced advertising resulted from these advertisers switching to WRMF because AVhitby began broadcasting prior to the end of the non-compete provision. There was no proof that the lost profits were not the result of the more competitive advertising costs at WRMF, the level of competence of her replacement at WEAT, the introduction of a new morning team at WOLL, or the improved ratings of WKGR, all factors we enumerated in our prior opinion.
 

 In fact, the plaintiffs own testimony revealed that AVhitby could not be the WRMF spokesperson for TLC Laser because she was the spokesperson for a competitor Rothchild, who advertised on WRMF before AVhitby left WEAT. The Princess did not advertise on WEAT for
 
 *75
 
 several months prior to Whitby’s departure and then again advertised on WEAT after her departure. The Palm Beach Zoo did not advertise the August and September before Whitby left, and then bounced a substantial check, which was not accounted for in the summary. Borton Volvo switched to television advertising and never advertised on WRMF.
 

 Further, the corporate defendants argue, and we agree, that the only testimony linking the losses to Whitby’s departure constituted inadmissible hearsay. Section 90.701, Florida Statutes, requires a lay witness to base his or her opinion upon facts the witness has “perceived.” A lay witness may not rely on hearsay in forming an opinion. Here, both Larson and Goldstein based their opinion that the accounts were lost due to Whitby’s departure because they either “believed so” or were “told so” by the advertiser’s agent. Stras-ser and Greenwald then testified about what the account representatives, like Larson and Goldstein, had reported.
 

 We also agree with the defendants on the issue of general overhead expenses. A percentage of overhead expenses should have been deducted from the projected lost profits. On this issue, three cases are worth discussion:
 
 Boca Developers, Inc. v. Fine Decorators, Inc.,
 
 862 So.2d 803 (Fla. 4th DCA 2003);
 
 RKR Motors, Inc. v.
 
 Associated
 
 Uniform Rental & Linen Supply, Inc.,
 
 995 So.2d 588 (Fla. 3d DCA 2008); and
 
 Knight Energy Services, Inc. v. C.R. International Enterprises, Inc.,
 
 616 So.2d 1079 (Fla. 4th DCA 1993).
 

 Both
 
 Boca Developers
 
 and
 
 RKR Motors
 
 require a plaintiff to account for overhead expenses. “Requiring a deduction of a share of fixed costs related to the performance of a contract allows for a true measurement of the amount the non-breaching party would have earned on the contract had there been no breach, which is the proper measure of damages.”
 
 RKR Motors,
 
 995 So.2d at 593. Here, even though the plaintiff deducted the sales commission and talent fees, it did not deduct the general overhead expenses.
 

 The plaintiffs rely on
 
 Knight Energy
 
 to argue that as long as there was testimony that the overhead expenses would have been realized anyway, there was no need to deduct them. However,
 
 Knight Energy
 
 preceded our opinion in
 
 Boca Developers
 
 and the Third District’s decision in
 
 RKR Motors.
 
 Further, the
 
 Knight Energy
 
 court based its decision not to require a deduction of overhead expenses on the defendant’s inability “to demonstrate that some overhead expense must have been required to perform” the contract. 616 So.2d at 1080. Given these facts, we wrote: “[w]e are not in a position to state that no reasonable juror could return the verdict as awarded.”
 
 Id.
 
 at 1080-81. Contrary to the plaintiffs assertion, there was no broad statement that general overhead should never be deducted in determining lost profits.
 

 For all of these reasons, we find the plaintiffs second attempt to prove lost profits falls short of the burden it carried to provide competent substantial evidence that the losses were directly linked to the defendants’ alleged wrongdoing. We therefore reverse the compensatory damages award,
 

 This brings us to the punitive damage award. We also have
 
 de novo
 
 review of whether a punitive damages award exceeds the boundaries of due process as guaranteed by the United States Constitution.
 
 Engle v. Liggett Group, Inc.,
 
 945 So.2d 1246, 1263 (Fla.2006). We must first address whether punitive damages may be awarded in the absence of the compensatory damage award. Our decision in
 
 Morgan Stanley & Co., Inc. v.
 
 
 *76
 

 Coleman Holdings, Inc.,
 
 955 So.2d 1124 (Fla. 4th DCA 2007) is dispositive.
 

 In
 
 Morgan Stanley,
 
 we reviewed our supreme court’s decisions in
 
 Ault v. Lohr,
 
 538 So.2d 454 (Fla.1989) and
 
 Engle v. Liggett Group, Inc.,
 
 945 So.2d 1246 (Fla.2006). We held that punitive damages for fraud could not stand absent proof of nominal damages because a fraud claim, by necessity, required proof of “actual loss or injury from acting in reliance on the false representation.”
 
 Morgan Stanley,
 
 955 So.2d at 1132.
 

 We distinguished
 
 Ault,
 
 which permitted punitive damages absent a compensatory damage award. Unlike the fraud claim in
 
 Morgan Stanley,
 
 “actual injury or compensatory damages are not essential to stating a cause of action
 
 for
 
 assault and battery.”
 
 Id.
 
 We then read
 
 Engle
 
 “as addressing the order of proof in determining entitlement to punitive damages,” and not as supporting an award of punitive damages where there is no nominal or compensatory damage award.
 
 Id.
 
 at 1133.
 

 The plaintiffs claim against the corporate defendants was tortious interference with a business relationship. Such a claim requires proof of the following elements: “(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant’s knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the interference.”
 
 Palm Beach County Health Care Dist. v. Prof'l Med. Educ., Inc.,
 
 13 So.3d 1090, 1094 (Fla. 4th DCA 2009) (emphasis added) (quoting
 
 Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.,
 
 742 So.2d 381, 385 (Fla. 4th DCA 1999)).
 

 Like the fraud claim in
 
 Morgan Stanley,
 
 the tortious interference claim here “cannot stand where ... no legally cognizable damage was shown as a result of the alleged [wrongdoing].” 955 So.2d at 1132. Because we reverse the compensatory damage claim, the punitive damages must also fall.
 
 See id.
 
 at 1132-33.
 

 We next review the punitive damage award for excessiveness. Unlike our recent opinion in
 
 Lawnwood Medical Center, Inc. v. Sadow,
 
 43 So.3d 710, 2010 WL 1066833 (Fla. 4th 2010), this case involves “purely economic consequences of only slight individual financial harm.”
 
 Id.
 
 at 726. For this reason, the punitive damage award is subject to the full three-part analysis set forth in
 
 State Farm Mutual Automobile Insurance Co. v. Campbell,
 
 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) and
 
 BMW of North America, Inc. v. Gore,
 
 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), and adopted by our supreme court in
 
 Engle.
 
 But, let us set the backdrop for that analysis.
 

 “The modern Anglo-American doctrine of punitive damages dates back at least to 1763, when a pair of decisions by the Court of Common Pleas recognized the availability of damages ‘for more than the injury received.’ ”
 
 Exxon Shipping Co. v. Baker,
 
 — U.S. —, —, 128 S.Ct. 2605, 2620, 171 L.Ed.2d 570 (2008) (quoting
 
 Wilkes v. Wood,
 
 Lofft 1, 18, 98 Eng. Rep. 489, 498, 1763 WL 36 (1763) (Lord Chief Justice Pratt)). “Awarding damages beyond compensatory was not, however, a wholly novel idea even then, legal codes from ancient times through the Middle Ages having called for multiple damages for certain especially harmful acts.”
 
 Id.
 
 But, those damages were “justified as punishment for extraordinary wrongdoing” meant “ ‘to deter from any such proceeding for the future
 
 ....’” Id.
 
 (quoting
 
 Wilkes,
 
 Lofft at 19, 98 Eng. Rep., at 498-99).
 

 
 *77
 
 Today, it is accepted that punitive damages “are aimed not at compensation but principally at retribution and deterring harmful conduct.”
 
 Id.
 
 at 2621 (footnote omitted). Still, we should be mindful of the historical purpose for punitive damages because it has guided the Court to its existing framework for evaluating whether the award is so excessive that it violates the Due Process Clause. “[A] penalty should be reasonably predictable in its severity, so that even Justice Holmes’s ‘bad man’ can look ahead with some ability to know what the stakes are in choosing one course of action or another.”
 
 Id.
 
 at 2627 (citing
 
 The Path of the Law,
 
 10 Harv. L. Rev. 457, 459 (1897)). With this framework in mind, we review the award in light of recent case law.
 

 The three-part analysis articulated in
 
 State Farm
 
 and
 
 BMW
 
 requires us to review:
 

 (1) the degree of reprehensibility of the defendant’s misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.
 

 Engle,
 
 945 So.2d at 1264 (quoting
 
 State Farm,
 
 538 U.S. at 418, 123 S.Ct. 1513 (citing
 
 BMW,
 
 517 U.S at 575, 116 S.Ct. 1589)). Having undertaken that analysis, we find the punitive damage award runs afoul of the Due Process Clause of the United States Constitution.
 
 See id.
 
 at 1265.
 

 I. Reprehensibility
 

 To sustain an award of punitive damages, the character of negligence must be of a
 

 gross and flagrant character, evincing reckless disregard of human life, or of
 

 the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.
 

 Air Ambulance Prof'ls, Inc. v. Thin Air,
 
 809 So.2d 28, 31 (Fla. 4th DCA 2002) (quotations and citations omitted). In evaluating reprehensibility, we must consider whether:
 

 the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.
 

 State Farm,
 
 538 U.S. at 419, 123 S.Ct. 1513 (citing
 
 BMW,
 
 517 U.S. at 576-77, 116 S.Ct. 1589). The existence of one of these may not be sufficient while the absence of all “renders any award suspect.”
 
 Id.
 

 The requisite level of reprehensibility is simply not present here. In
 
 Whitby I,
 
 we rejected the plaintiffs argument that the corporate defendants did anything more than merely induce Whitby to breach her employment agreement. 951 So.2d at 900. We held the plaintiff “never presented evidence to establish that it sustained damages from the alleged tortious interference independent from the damages it sustained as a result of the alleged breach of the non-compete covenant.”
 
 Id.
 

 The evidence established that WRMF’s president instructed his execu
 
 *78
 
 tives to ask Whitby to work for WRMF, and allowed her to go on the air the same day she left WEAT.
 
 [8]
 
 WRMF launched an aggressive advertising campaign including press conferences, flyers, airplane banners, and television, newspaper, and radio ads, including spoofs using Whitby’s name, voice, and likeness. While the evidence supported a finding of tortious interference, it did not rise to the requisite level of gross and flagrant behavior for an award of punitive damages.
 

 The harm here was economic; not physical. As Judge Farmer wrote in
 
 Lawn-wood,
 
 economic cases provide a low “disapproval quotient,” are missing the enormity factor, and reprehensibility is dubious at best.
 
 See Lawnwood,
 
 43 So.3d at 730. The tortious conduct alleged here did not evince an indifference or reckless disregard of health or safety. The conduct did not involve repeated actions, but was the isolated incident involving Whitby’s violation of a non-compete provision. And, there was no evidence that WEAT had financial vulnerability. Indeed
 
 Laumwood
 
 now mandates that misconduct “be gravely deplorable, deserving of severe condemnation, even threatening basic interests of an individual beyond purely economic loss. Conduct deserving the harshest punitive damages would be odious. It would pass moral bounds, be wicked or outrageous, and constitute a grave offense against right or decency.”
 
 Id.
 
 at 726-27.
 

 In
 
 Lawnwood,
 
 Judge Farmer recognized the “almost trivial, ... minor economic injuries” at issue in
 
 State Farm
 
 and
 
 BMW
 
 “pale into insignificance next to the calumnies proven [in
 
 Lawnwood
 
 ].”
 
 Lawnwood,
 
 43 So.3d at 730. Here, the conduct was not gravely deplorable, odious, wicked or outrageous. Rather, it was a hard fought battle for dominance in the radio industry. As the testimony at trial revealed, the radio business is very competitive. It is not unusual for radio personalities to broadcast information about current events, tell jokes, and perform funny on-air skits. The conduct simply failed the test of reprehensibility.
 

 This is not the first time we have reviewed a punitive damages award in a tortious interference claim. In
 
 Imperial Majesty Cruise Line, LLC v. Weitnauer Duty Free, Inc.,
 
 987 So.2d 706 (Fla. 4th DCA 2008), we reversed a $75,000 punitive damage award in a $1,000 nominal damages case arising from a cruise line’s tor-tious interference with a contract between Broward County and a duty free store located at Port Everglades. We noted:
 

 Imperial essentially sought to preclude competition in the sale of duty-free goods. To that end, Imperial barricaded and prevented its passengers from shopping at WDF’s store. The trial court found that Imperial’s “actions were calculated, predatory, and excessive”; however, such conduct fails to rise to the degree of reprehensibility required for a punitive damages award. Although Imperial’s interference was not justified, the nature, extent, and enormity of the wrong warrant against punitive damages. Imperial’s conduct did not rise to truly culpable behavior, for which damages are tenable to “express society’s collective outrage.” Finding Imperial’s conduct not sufficiently egregious, we reverse the punitive damages award.
 

 Id.
 
 at 708 (citations omitted). As in
 
 Imperial Majesty,
 
 the conduct here did not reach the level of reprehensibility required for a punitive damage award.
 

 
 *79
 

 2. Proportionality
 

 Next, we consider the proportionality of the punitive damages award to the compensatory damages.
 
 See Engle,
 
 945 So.2d at 1264. As
 
 Engle
 
 instructs, the punitive damages award requires an evaluation of the “amounts awarded to ensure a reasonable relationship between” the compensatory and punitive damages.
 
 Id.
 

 “Single-digit multipliers are more likely to comport with due process, while still achieving the State’s goals of deterrence and retribution, than awards with ratios in range of 500 to 1.... ”
 
 Id.
 
 at 1264-65 (quoting
 
 State Farm,
 
 538 U.S. at 425, 123 S.Ct. 1513 (citing
 
 BMW,
 
 517 U.S. at 582, 116 S.Ct. 1589)). While Judge Farmer abandoned the proportionality analysis in
 
 Lawnwood,
 
 a slander per se claim, he acknowledged “that the federal rule of a fixed ratio between punitive and compensatory damages was intended to apply primarily” to cases that involved pure economic loss.
 
 Lawnwood,
 
 43 So.3d at 723. The “proportional ratio analysis [is] required in negligence or business practices cases with only modest monetary or financial loss....”
 
 Id.
 
 at 725. Indeed, our supreme court noted that single-digit multipliers were “more likely to comport with due process.”
 
 Engle,
 
 945 So.2d at 1264. This is such a case.
 

 When we examine the ratio of punitive to compensatory damages, we find the award exceeds the single-digit gauge for proportionality and fails to bear the reasonable relationship required by the Due Process Clause. The jury found compensatory damages of $126,511.48. It subsequently awarded $2.3 million in punitive damages against each of the three corporate defendants, for a total of $6.9 million. However, having reversed the compensatory damages award, the ratio is now 0 to 6.9 million.
 

 Even if we were to consider the $126,511.48 in compensatory damages awarded, we would find the punitive damage award, that is approximately 55 times larger than the compensatory damage award, exceeds reasonable predictability. It exceeds the level that a “bad man” would be on notice of so as to avoid the punishment.
 
 Exxon,
 
 128 S.Ct. at 2627. The punishment is, therefore, disproportionate to the harm.
 

 3. Comparable Civil Penalty
 

 Florida law does not provide a comparable civil penalty for tortious interference with a contract. We are therefore unable to make this comparison.
 

 Having concluded the three part analysis, we find the punitive damages award unsustainable.
 
 [9]
 

 This case provides the perfect juxtaposition of the punitive damage analysis in negligence and economic loss cases against the shortened analysis applied in
 
 Lawn-wood
 
 for the unique claim of slander per se. Judge Farmer carefully distinguished the conduct in
 
 BMW
 
 and
 
 State Farm
 
 resulting in economic loss from the “despicable” conduct resulting in the “malevolent destruction” of a doctor’s personal reputation in
 
 Lawnwood. Lawnwood,
 
 43 So.3d at 731. He also conceded the fraud claim in
 
 Morgan Stanley
 
 was entirely different from the slander per se claim in
 
 Lawn-wood
 
 due to the latter’s “conclusive legal presumption of loss or damage” that is
 
 *80
 
 intrinsic in a slander per se claim.
 
 Id.
 
 at 729. It is because of the uniqueness of the claim in
 
 Lawnwood
 
 that we easily distinguish it from today’s analysis in an economic loss case. Just as Judge Farmer diminished the nature of the harm in
 
 BMW
 
 and
 
 State Farm,
 
 we diminish the nature of the harm in this case.
 

 We thus acknowledge the limited reach of
 
 Lawnwood
 
 and embrace its clear line of demarcation for evaluating negligence and economic loss cases differently than slander per se cases. We adhere to the full three-part analysis for punitive damage awards in economic loss and negligence cases developed in
 
 BMW
 
 and
 
 State Farm,
 
 and adopted by our supreme court in
 
 En-gle.
 
 The judgment is reversed and the case remanded for entry of a judgment in favor of the defendants.
 

 Reversed and remanded to vacate the judgment.
 

 STEVENSON and TAYLOR, JJ., concur.
 

 [1]
 

 . James Crystal Licenses is a Delaware corporation, which formerly held the license to WRMF-FM, James Crystal Holdings is a Delaware corporation, which formerly operated WRMF-FM, and James Crystal Enterprises is a Delaware corporation, which formerly held the assets for WRMF.
 

 [2]
 

 . OmniAmerica sold WEAT to Chancellor Broadcasting, which in turn sold the station to American Radio Systems. American Radio then mei'ged with CBS Radio, which has since changed its name to Infinity.
 

 [4]
 

 . The injunction was entered seven months after Whitby left WEAT and expired twelve months from the date of its entry. Whitby remained off the air for one year.
 

 [5]
 

 . On remand, the trial court held an eviden-tiary hearing on the enforceability of the non-compete provision. The court found the covenant enforceable, but limited the area to a 100-mile radius. All defendants continue to claim the covenant is unenforceable; we disagree.
 

 [6]
 

 . Tim Reever, an employee of WRMF, testified that he had a relationship with the Palm Beach Princess and Cingular/Bellsouth before Whitby began working there, and that TLC Laser stopped advertising on the radio altogether before Whitby began working for WRMF.
 

 [7]
 

 . They argue the court erred in denying the motion for directed verdict because the damages were not supported by competent substantial evidence. First, there was no evidence tying the alleged losses directly to Whitby. Second, Greenwald's testimony constituted inadmissible hearsay. Third, the summary was improperly admitted because the plaintiffs failed to give the required timely written notice and provide documentation, and because the summary was hearsay. Fourth, the methodology employed to determine lost profits was unacceptable because the plaintiff used a time period that exceeded Whitby’s violation of the non-compete provision. WEAT also failed to account for overhead expenses.
 

 [8]
 

 . The corporate defendants produced testimony that they acted on advice of counsel, who had advised that the non-compete provision was unenforceable.
 

 [9]
 

 . We have not overlooked state law on punitive damages. We have relied, however, on our supreme court's decision in
 
 Engle
 
 in deciding this case. As recognized in
 
 Lawnwood,
 
 section 768.73(l)(c), Florida Statute provides no cap on punitive damages when the jury makes a finding of “specific intent to harm.” Nevertheless, the ultimate decisive factor is the United States Constitution.