[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13368

_____

FINANCIAL INFORMATION TECHNOLOGIES, LLC,

Plaintiff-Appellee -
Cross-Appellant,

*versus*

ICONTROL SYSTEMS, USA, LLC,

Defendant-Appellant -
Cross-Appellee.

_____

Appeals from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:17-cv-00190-SDM-SPF

_____

Before JORDAN, NEWSOM, Circuit Judges, and BURKE, District Judge.

NEWSOM, Circuit Judge:

Financial Information Technologies ("Fintech") and iControl Systems are competitors. Both companies sell software that processes alcohol-sales invoices within 24 hours. Fintech operated in that space alone for several years until iControl entered the market and began selling a very similar product at a lower price point. After losing a number of customers to iControl, Fintech initiated this lawsuit alleging misappropriation of trade secrets. The jury found in Fintech's favor and awarded both compensatory and punitive damages.

iControl sought a new trial on liability and judgment as a matter of law on damages, contending with respect to the former that Fintech's alleged trade secrets were readily ascertainable—and thus not "secret"—and with respect to the latter that Fintech hadn't proved lost profits because it hadn't deducted fixed and marginal costs from its revenue calculations. For its part, Fintech sought a permanent injunction broadly prohibiting iControl from using either company's software. The district court denied all three motions, and both parties appealed.

After careful review, we affirm in part, reverse in part, and remand for further proceedings. In particular, we conclude that the district court (1) correctly denied iControl's new-trial motion on liability, (2) erred in denying iControl's JMOL motion on

damages because Fintech didn't deduct marginal costs in calculating lost profits, and (3) correctly refused Fintech's requested injunction.

## I

Fintech and iControl sell niche computer software that rapidly processes electronic payments between retailers and wholesale distributors of alcoholic beverages. Such software is useful because many states require retailers to pay cash on delivery (*i.e.*, forbid payment by credit) for alcohol shipments. Processing and paying invoices within 24 hours requires specialized technology. Fintech spent about 15 years developing software that quickly processes electronic fund transfers between alcohol retailers and distributors. For a while, Fintech was the only game in town and charged a correspondingly high price for its software.

In 2013, iControl began selling software similar to Fintech's at a lower price. For years before, iControl had been in the business of processing invoices and facilitating electronic bank transfers for other products. As it began servicing the alcohol industry, iControl hired both (1) Mark Lopez, Fintech's former VP of Operations, who had been heavily involved in designing Fintech's software, and (2) Andrew Sanderson, a former Fintech sales representative. Both Lopez and Sanderson were bound by nondisclosure agreements with Fintech. Not long after hiring Lopez and Sanderson, iControl managed to lure away several Fintech customers.

Having lost several customers, Fintech filed this lawsuit in 2017, alleging that iControl violated the Florida Uniform Trade Secrets Act by misappropriating seven Fintech trade secrets.[1] Fintech sought both damages and injunctive relief. The district court held a jury trial on the FUTSA claim, and the jury returned a general verdict in Fintech's favor, finding that it had proved by a preponderance of the evidence that iControl misappropriated its trade secrets and, further, that iControl acted willfully and maliciously in doing so. The jury awarded Fintech $2.7 million in actual damages and $3 million in exemplary damages, and the district court entered judgment on the jury's verdict.

iControl filed a motion for a new trial on liability and a renewed JMOL motion on damages. For its part, Fintech moved for a permanent injunction "prohibiting iControl from doing business in the regulated commerce industry." The district court denied all three motions. With respect to iControl's liability-based new-trial motion, the court reasoned that "[a] reasonable juror could find that iControl misappropriated Fintech's trade secrets":

> Fintech (1) presented evidence showing that iControl hired Fintech's former software engineer and rapidly developed a competing suite of software features that perform substantially the same function as Fintech's

---

[1] Fintech initially also alleged violation of the Defend Trade Secrets Act of 2016, tortious interference, violation of the Florida Deceptive & Unfair Trade Practices Act, misleading advertising, injurious falsehood, and unfair competition, but only the FUTSA claim went to trial.

software features, (2) presented both direct and circumstantial evidence supporting the inference that Fintech's former software engineer divulged the methods by which Fintech developed the software features, and (3) presented expert testimony identifying with reasonable particularity the features misappropriated by Fintech's former software engineers.

The court sustained the jury's willful-and-malicious finding, concluding that the jury reasonably could have inferred that iControl schemed to hire Lopez to misappropriate Fintech's software features. With respect to damages, the court concluded that Fintech carried its burden by presenting evidence that its "fixed-cost savings were trivial due to the relatively few clients lost to iControl . . . and that [its] marginal costs per lost client were between zero and three percent of revenues."

Fintech renewed its motion for a permanent injunction, which the district court again denied, reasoning that the proposed injunction was overbroad. Both parties appealed.

Before us, iControl argues that the district court should have granted a new trial on liability because Fintech's seven alleged trade secrets were never actually secret. At minimum, iControl contends that the jury's willful-and-malicious finding cannot stand. iControl further contends that the district court should have awarded it JMOL on damages because Fintech proved only lost *revenues*—not lost *profits*, as required—and failed to properly deduct its fixed and marginal costs. On cross-appeal, Fintech asserts

that the district court should have awarded it a permanent injunction because, it says, its proposed remedy was reasonably tailored to restrain iControl's misappropriation.

We will take up each of the three issues—liability, damages, and the injunction—in turn.

## II

### A

Overturning a jury's liability finding is a difficult task under any circumstances. iControl faces an especially steep climb for two reasons.

First, the jury rendered a general verdict—it didn't specify which of the seven alleged trade secrets iControl misappropriated. Accordingly, Fintech needs to show evidence of misappropriation only as to one. *See Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1265 (7th Cir. 1992) (holding that a general jury verdict in a trade-secrets case must be affirmed when the evidence supports misappropriation of at least one secret); *cf. also Griffin v. United States*, 502 U.S. 46, 56–57 (1991) (holding that a general guilty verdict on a multiple-object conspiracy need not be set aside if the evidence is adequate to support conviction as to one of the objects).

Second, for whatever reason, iControl didn't move for JMOL on liability in the district court. Had it done so, we would have reviewed the district court's denial de novo. *See St. Louis Condo. Ass'n, Inc. v. Rockhill Ins. Co.*, 5 F.4th 1235, 1242 (11th Cir.

2021). As matters stand, iControl is stuck with the more deferential abuse-of-discretion standard applicable to new-trial motions. Accordingly, the only question before us is whether the district court abused its discretion in concluding that "the verdict [was] against the great weight of the evidence." *Hercaire Int'l, Inc. v. Argentina*, 821 F.2d 559, 562 (11th Cir. 1987). Ordinarily, given that standard, we "will reverse a decision denying a motion for new trial only where there is an absolute absence of evidence to support the verdict." *Id.*

**1**

To prove liability under FUTSA, a plaintiff must show that "(1) it possessed a 'trade secret' and (2) the secret was misappropriated." *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018) (quotation omitted). A "trade secret" is defined as follows:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and *not being readily ascertainable by proper means by*, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4) (emphasis added).  Misappropriation occurs when a trade secret is acquired "by someone who knows or has reason to know that the secret was improperly obtained or who used improper means to obtain it."  *Yellowfin*, 898 F.3d at 1297 (quotation omitted).

By definition, something that is already readily ascertainable can't be misappropriated.  As a general matter, software source code is not readily ascertainable and, accordingly, qualifies for trade-secret protection. *See Warehouse Sols., Inc. v. Integrated Logistics, LLC*, 2014 WL 12647878, at *6 (N.D. Ga. July 7, 2014), *aff'd*, 610 F. App'x 881 (11th Cir. 2015).  But aspects of computer software that *are* readily ascertainable don't qualify.  *See IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("[T]hings that any user or passer-by sees at a glance are 'readily ascertainable by proper means' . . . and a trade-secret claim based on readily observable material is a bust.").  iControl contends that each of Fintech's seven alleged trade secrets was readily ascertainable.  Before we delve into the secrets' ascertainability, we will briefly explain Fintech's software and the seven trade secrets at issue.[2]

---

[2] In its briefs to us, iControl asserts that Fintech has consistently failed to allege its trade secrets with "reasonable particularity."  To be sure, it is important for a plaintiff to allege trade secrets with particularity at the pleading stage in order to give the defendant adequate notice of the material that is allegedly subject to trade-secret protection.  But those concerns dissipate when, as here, the alleged trade secrets have been litigated and adjudicated in a full-blown trial.  *Cf. Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (holding that a party may not appeal an order denying summary judgment after a full trial on the merits because

20-13368                Opinion of the Court                    9

The essence of Fintech's software is what it calls "database architecture."  Database architecture involves both designing a database that can "take alcohol invoices from dozens of different distributors in different formats and normalize them into a central database" and configuring a "hierarchy of data within an invoice" that enables such normalization.  Trial Transcript (Day 3) at 52–54.  For example, many alcohol-sale invoices must make adjustments for discounts, surcharges, etc.  Fintech's software treats these "SAC" codes (for service promotions, adjustments, and charges) as line items rather than header adjustments.  Then, to further accelerate the invoicing process, Fintech's software utilizes certain "exception rules," which investigate each field of every invoice to check for potential errors or missing information.  An in-system editor called the "invoice fixer" allows distributors to enter the database and make corrections without delaying the payment cycle.

Fintech's software groups corrected invoices based on the originating and receiving banks, aggregates them, and calculates a single ACH transaction using proprietary rounding calculations.[3] To ensure timely payments, Fintech maintains a series of "white filters" with banks to minimize the risk that any transaction will get

---

"[o]nce the case proceeds to trial, the full record developed in court supersedes" the prior record); *Nolfi v. Ohio Kentucky Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012) ("Though *Ortiz* applies specifically to summary judgment, its logic applies with equal force to questions involving pleadings.").

[3] ACH (Automated Clearing House) is a network used for electronically moving money between bank accounts across the United States.

blocked at the last minute.  Finally, Fintech develops and maintains several system interfaces based on its clients' particular accounting needs to convey payment information between distributors and retailers.

In addition to providing invoice-payment services, Fintech uses invoice data collected over time to conduct business-intelligence analysis, which it makes available to its clients through a "user portal."  The portal is unique in the industry in that it allows each client to control which of its employees can access what information.

Based on this invoice-payment process, Fintech's expert witness identified the following seven "trade secrets":

> (1) database architecture;

> (2) the exception rules and the invoice fixer;

> (3) calculations for ACH transactions;

> (4) methods for maintaining and using white filters;

> (5) payment-reconciliation interfaces;

> (6) analysis, normalization, and reports generated for the user portal; and

> (7) user-portal design that allowed clients to administer their own users within Fintech's online system.

In light of the governing standard—pursuant to which we ask only whether "there is an absolute absence of evidence to support the verdict," *Hercaire*, 821 F.2d at 562—we hold that the proof

presented at trial permitted a reasonable jury to find that at least one of Fintech's alleged trade secrets was not readily ascertainable and was instead misappropriated. Fintech showed the jury emails and iControl documents indicating that Lopez had helped iControl discover Fintech's internal processes to aid its software development. For instance, when iControl was initially having problems with SAC adjustments in its invoices, its chief technology officer asked for Lopez's help—after which iControl, like Fintech, began treating the adjustments as line items. Similarly, Fintech submitted emails in which Lopez advised iControl management about correcting rounding issues that iControl was confronting when calculating ACH transactions.

So too, with respect to white filters, Fintech submitted a series of emails between iControl employees and Fifth Third Bank in which the bank reported that it couldn't navigate the ACH payment process despite "doing business for Fintech"—which, in turn, caused iControl to seek Lopez's assistance. Those emails suggest—or certainly could to a reasonable jury—that Fintech had some specialized method of white-filter maintenance that was not readily ascertainable to iControl or the bank. Finally, Fintech submitted an iControl document authored by Lopez and Sanderson that contained screenshots of Fintech's user portal—which a Fintech witness testified was password-protected and accessible only to Fintech customers and employees—and details about how to build something similar. That evidence could suggest to a reasonable

jury that iControl misappropriated information about Fintech's user portal rather than develop it independently.

Because the jury returned a general verdict, we needn't assess each secret individually to determine whether each one was readily ascertainable. Fintech's trial evidence suggests that at least some of its seven alleged trade secrets were *not* readily ascertainable to iControl and were instead improperly obtained through Lopez's and Sanderson's aid. Because there is no "absolute absence of evidence" of misappropriation, the district court was within its discretion to deny iControl's new-trial motion.

## 2

iControl contends that even if the jury's baseline liability finding stands, its exemplary-damages award cannot. FUTSA permits exemplary damages if "willful and malicious misappropriation exists." Fla. Stat. § 688.004(2). In *Perdue Farms Inc. v. Hook*, a Florida court concluded that exemplary damages are permissible under FUTSA when "the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others." 777 So. 2d 1047, 1053 (Fla. 2d DCA 2001) (quotation omitted). It is for the jury to determine whether a misappropriation was willful and malicious. *Id.* at 1052.

Given the standard of review applicable to new-trial motions, we conclude that the jury here reasonably could have inferred from the evidence presented that iControl schemed to hire Lopez and Sanderson to misappropriate Fintech's software

features.  Indeed, iControl acknowledged (internally) the possibility that Fintech might sue when it hired Sanderson.  And testimony at trial indicated that iControl hired Lopez to help with "strategy, marketing, product development, product roadmapping, as well as the delivery of specific technologies, *mainly writing code to support our regulated commerce*."  Trial Transcript (Day 2) at 114 (emphasis added).  Again, we simply can't say that there is an "absolute absence of evidence" that would justify setting aside the jury's findings.

## B

The damages calculation here presents thornier issues. iControl filed a JMOL motion on damages, and we review the denial of that motion de novo, viewing the evidence in the light most favorable to Fintech.  *St. Louis Condo. Ass'n*, 5 F.4th at 1242.  A JMOL motion should be granted only when there is no legally sufficient evidentiary basis from which a reasonable jury could render the verdict that this one did.  *Id.*

In relevant part, FUTSA's damages provision provides as follows:

> Damages can include both *the actual loss caused by misappropriation* and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss.  In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by imposition of

14                    Opinion of the Court                    20-13368

> liability for a reasonable royalty for a misappropria-
> tor's unauthorized disclosure or use of a trade secret.

Fla. Stat. § 688.004(1) (emphasis added).  The dispute in this case is about what constitutes "actual loss."   iControl contends that Fintech can recover only lost profits—that is, the revenue it would have received from its lost customers *less* the costs it would have incurred servicing those customers.  iControl further contends that Florida law requires that Fintech subtract both fixed and marginal costs from its revenues to calculate lost profits.[4]

We understand Fintech to agree that it can recover only lost profits.  Even so, it argues (1) that Florida law doesn't require deduction of fixed costs in trade-secret cases, (2) that its marginal costs were negligible, and (3) that it can therefore, in essence, recover lost revenue.[5]   We will address iControl's fixed- and marginal-cost arguments in turn.

_____

[4] We reject Fintech's argument that iControl failed to preserve its fixed-cost argument for appeal.  iControl has consistently maintained that Fintech must deduct *all* costs in order to prove lost profits.  Even in its initial JMOL motion, iControl complained that Fintech's damages witness didn't calculate "overhead" (*i.e.*, fixed) costs.

[5] In its pleadings and initial disclosures in the district court, Fintech stated that its damages were based on "lost revenue."  Fintech belatedly offered a "rebuttal" expert report purporting to perform an actual lost-*profits* analysis, but the magistrate judge disallowed the late report.  Accordingly, Fintech was forced to go to trial without a proper damages expert who could explain its costs. When, at trial, Fintech sought to put on a traditional lost-profits analysis, the district court disallowed it, but permitted Fintech to proceed on a pseudo-lost-

20-13368                Opinion of the Court                15

As a preliminary matter, though, a bit of definitional house-keeping:  It's important to be clear at the outset about what we mean by "fixed" and "marginal" costs.  The most basic way to distinguish these concepts—as economists do—is this:  Fixed costs don't (at least directly) vary based on output volume, while marginal costs measure the change in cost associated with a change in output.  *See* N. Gregory Mankiw, PRINCIPLES OF MICROECONOMICS 266–68 (6th ed. 2011).

Fixed costs, that is, are those that remain essentially the same regardless of the number of a company's customers or products.  These may include rent, utilities, salaries, depreciation, insurance, property taxes, R&D, etc.  Of course, a dramatic change in the volume of business will likely cause some change in fixed-cost spending.  A thriving company, for instance, may need to expand (or even move) offices and thereby incur higher rent.  Even so, rent remains a "fixed" cost because it is not directly influenced by the company's sales or production volume.

Marginal costs, on the other hand, are tied directly to output volume.  They are often defined as the costs associated with producing *one* more unit of output or servicing *one* more customer, and they are calculated by dividing the change in total cost by the change in output.  *Id.* at 268.  When calculating marginal costs over

profits theory under the caveat that Fintech's damages witness would testify that its costs were "trivial."  The district court characterized this narrow theory as "sort of a crevasse in [the] law."

a change in output volume during which fixed costs remain constant, marginal costs will depend only on the change in variable costs.

1

First, fixed costs.  iControl contends that Florida law requires plaintiffs to apportion their fixed costs across all customers and deduct these costs from revenues in a lost-profits analysis.  For the following reasons, we disagree.

We start with the text of FUTSA's damages provision—which, again, permits damages for "the actual loss caused by misappropriation."  Fla. Stat. § 688.004(1).  Here, Fintech lost a number of customers when iControl entered the market.  Although Fintech lost the revenues associated with those customers, some of its losses were offset by the elimination of *marginal* costs that it no longer had to incur to service those customers.  So its "actual loss" was lower than its lost revenue. (More on marginal costs shortly.) Importantly, though, the evidence doesn't clearly show that Fintech incurred any reduction in its total *fixed* costs.  Accordingly, no fixed-cost savings offset its misappropriation-based losses. Given that, it's not clear to us why Fintech should have to deduct fixed costs that it would have incurred anyway—and that, therefore, weren't at all related to iControl's conduct or Fintech's response. *Accord Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 618 (3d Cir. 1989) ("The effect on net income must be measured by revenue lost less costs avoided.  This translates into lost revenue less the variable cost of producing this lost revenue.  Fixed

20-13368                 Opinion of the Court                          17

or unavoidable costs are by definition unrelated to the individual income producing activity and thus are not relevant . . . ." (footnote omitted)).

Additionally, FUTSA permits recovery only of those losses that are "caused by" misappropriation. *See Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So.3d 640, 644–46 (Fla. 4th DCA 2012) (per curiam). Here, there is no clear causal link because Fintech's fixed costs remained unaffected by iControl's misappropriation. *See DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 474 (6th Cir. 1996) (reasoning that deducting fixed costs would impermissibly base the lost-profits calculation on "overall economic performance instead of on the basis of the transactions lost" and wouldn't place the plaintiff "in as good a position as it would have been if the alleged tort had not occurred"). If, as iControl urges, we were to require Fintech to deduct fixed costs from lost revenues anyway, we would underestimate the magnitude of Fintech's loss "caused by" iControl's misappropriation.[6] That outcome seems

---

[6] To illustrate this point, consider a hypothetical company that services 10 customers. The company earns $100 in revenues per customer, and it costs the company $10 to sign up and service each customer. Thus, the company makes a profit of $90 per customer, for a total of $900. Separately, the company incurs $500 in fixed operating expenses, bringing its net profit to $400. Now, suppose the company loses two customers but that this loss doesn't cause any change in the company's fixed expenses. The company's net profit will decrease to $220. The change in profits ($180) equals the revenues less marginal costs per lost customer (($100 - $10) x 2 = $180). If we required the company to deduct a pro rata share of its fixed costs from its per-customer profit for

contrary not only to common sense but also, and more importantly, to FUTSA's plain text.

iControl resists that conclusion by citing several contract cases. In the end, though, we think that those cases, properly understood, only bolster our holding. iControl is correct that in breach-of-contract situations, Florida law typically requires that both fixed and marginal costs be deducted from revenues to calculate lost profits. In *RKR Motors, Inc. v. Associated Uniform Rental & Linen Supply, Inc.*, 995 So.2d 588 (Fla. 3d DCA 2008), a Florida court explained the rationale for fixed-cost deductions, and its decision is worth exploring in some detail.

In that case, Associated Uniform agreed to rent and launder RKR's employees' uniforms. *Id.* at 590. RKR terminated the agreement, and Associated Uniform sued for breach of contract, seeking—among other remedies—"lost profits." *Id.* At trial, Associated Uniform's damages expert "based his calculation," in part, "on the *actual costs* that Associated Uniform did not incur due to RKR Motors' termination of the contracts." *Id.* at 592 (emphasis added). By contrast, "RKR Motors' expert concluded that all of Associated Uniform's *fixed costs* related to the contract must be considered and RKR Motors' relative portion must be included in the computation." *Id.* (emphasis added). In comparing the two experts' testimony, the court evidently differentiated between a calculation of

---

damages purposes, instead of recovering its actual loss of $180, it would only recover $80. The company would thus be undercompensated for its losses.

"actual costs" and a damages methodology that requires deduction of "fixed costs." *Id.*

To determine which damages methodology applied, the court went on to distinguish two Florida cases—*Knight Energy Services, Inc. v. C.R. International Enterprises, Inc.*, 616 So.2d 1079 (Fla. 4th DCA 1993) (per curiam), and *Boca Developers, Inc. v. Fine Decorators, Inc.*, 862 So.2d 803 (Fla. 4th DCA 2003). *See RKR*, 995 So.2d at 592. In *Knight*, the court noted that a contracting party seeking lost profits is entitled to "the contract price less any deduction for costs and expenses *necessary to fully perform*." 616 So.2d at 1080 (emphasis added). Ultimately, the court there didn't require any cost deduction because the plaintiff unequivocally stated that "no deductible costs or expenses [were] necessary to fully perform this contract." *Id.* In *Boca*, however, the court found that fixed costs had to be allocated across the board because there was no evidence to suggest that the fixed costs were not involved in the performance of the contract in question. 862 So.2d at 805–06. Importantly, the breaching party in that case ordinarily apportioned its fixed costs across other contracts but hadn't apportioned any to the contract at issue. *Id.* at 804–05. The court thus required deduction of "fixed costs such as rent and insurance related to those employees" who worked on the contract. *Id.*

Ultimately, the *RKR* court concluded that the intuition underlying Florida's contract cases is that *all* costs involved in performing a contract must be deducted from the contract price to ensure that the nonbreaching party doesn't get a windfall: "Requiring

a deduction of a share of fixed costs related to the performance of a contract allows for a true measurement of the amount the non-breaching party would have earned on the contract had there been no breach, which is the proper measure of damages." 995 So.2d at 593; *see also, e.g.*, *Indian River Colony Club, Inc. v. Schopke Constr. & Eng'g, Inc.*, 592 So.2d 1185, 1187 (Fla. 5th DCA 1992) (requiring deduction of reasonable value of supervisory services attributable to performing the contract and non-reimbursable operating expenses); *Fu Sheng Indus. Co. v. T/F Sys., Inc.*, 690 So.2d 617, 623 (Fla. 4th DCA 1997) (requiring accounting of all costs associated with the selling of the product for which lost profits were claimed); *Ballard v. Krause*, 248 So.2d 233, 234 (Fla. 4th DCA 1971) (requiring deduction of all costs and expenses necessary to perform the contract); *Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. & Assocs., PA.*, 501 So.2d 107, 109 (Fla. 3d DCA 1987) (requiring deduction of fixed and variable costs of performance from the contract price); *James Crystal Licenses, LLC v. Infinity Radio Inc.*, 43 So.3d 68, 75 (Fla. 4th DCA 2010) ("A percentage of overhead expenses should have been deducted from the projected lost profits.").

But Florida courts recognize that this contract-based damages methodology is different from a calculation of "actual costs." *See RKR*, 995 So.2d at 592. As already explained, by its terms, FUTSA permits damages only for "the *actual loss* caused by misappropriation." Fla. Stat. § 688.004(1). Accordingly, Florida's method of calculating damages in breach-of-contract disputes does not

necessarily carry over into FUTSA cases. *See HCA Health Servs. of Fla., Inc. v. CyberKnife Ctr. of Treasure Coast, LLC*, 204 So.3d 469, 472 (Fla. 4th DCA 2016) (suggesting that the fixed-cost-deduction method of calculating damages is specific to the contracts context because it best approximates "the benefit of the bargain" or "expectation interest" (quotation omitted)).

This conclusion is strengthened by *Murray v. Department of Transportation*, 687 So.2d 825 (Fla. 1997). In this *non*-contract business-damages case under another Florida statute, the Florida Supreme Court held that the calculation of business damages does not require "one mechanically applied, one-size-fits-all formula which would not produce proper results." *Id.* at 827. Because "business damages are inherently fact-intensive" and some costs "such as insurance . . . will continue to be the same regardless of the loss" of some customers, the court permitted a damages calculation that didn't deduct fixed costs. *Id. Murray* demonstrates (1) that statutory damages needn't be determined by the same method used in contract law and (2) that deduction of business costs that remain the same regardless of the loss of some customers isn't required.

In short, therefore, we agree with the district court that the jury was not required to deduct Fintech's fixed costs from its revenues to arrive at a proper "actual loss" measure.

**2**

Marginal-cost deduction presents a different challenge. Both iControl and Fintech agree that, in theory, a plaintiff must subtract the costs that it would have had to incur to service its lost customers from the revenues that it would have received from those customers. But Fintech argues that its "business loss was at the margins" and that it would have incurred only "trivial costs" in servicing the customers it lost to iControl. Br. of Appellee at 73 (quotation marks omitted). Accordingly, Fintech says, it was "up to the jury" to disregard those costs and award its full lost revenues. *Id.* Alternatively, Fintech argues that because its lost revenues were $2,721,925, and the jury awarded only $2,700,000, we can infer that the jury deducted some costs.

We begin with the evidence presented to the jury. At trial, Fintech's damages witness testified that adding customers to Fintech's platform entails "[m]inimal" costs. He claimed that Fintech's "cost of goods sold"[7] for all customers is "less than ten percent" and that "hard costs"[8] are "like three percent or less." Fintech incurs low marginal costs in adding additional customers to its platform, he explained, because it is a technology business and adding new customers to an already-written program doesn't

---

[7] "Cost of goods sold" encompasses the costs directly involved in producing the goods sold or the services delivered.

[8] The witness defined these as including "banking costs" and payments for "communication systems to send data back and forth."

translate into many more costs. Importantly, though, Fintech's witness provided no accounting of any costs to corroborate his testimony approximating them. He placed Fintech's lost *revenues* at "$2,721,925." In his closing statement, Fintech's lawyer stated—slightly differently—that "FinTech's total damage to date [is] *$2.7 million in lost revenue.*" Trial Transcript (Day 6) at 40 (emphasis added). "This is the amount of money," he said, "that FinTech lost because iControl misappropriated its trade secrets and *that's the amount of money that FinTech asks you, this jury, to award* against iControl." *Id.* (emphasis added). Following that statement, the jury returned a verdict of $2.7 million.

Missing from the trial record is any evidence that Fintech's marginal costs were *actually* zero. Had Fintech clearly presented that evidence, it might have been entitled to an award that didn't account for those costs. *See Knight*, 616 So.2d at 1080 (permitting award without cost deduction when the plaintiff unequivocally stated that no costs were incurred); *DXS*, 100 F.3d at 474 (same). But Fintech presented only evidence that its marginal costs were "minimal"—and "minimal" doesn't equal zero. Likewise, "three percent" and "ten percent" don't equal zero. Fintech requested $2.7 million in damages from the jury, and that is what it received. Although there was a small difference between, on the one hand, the revenue figure that Fintech presented at trial and, on the other, the amount that it sought in its closing statement and that the jury ultimately awarded, we can't speculate whether the jury deducted

24                    Opinion of the Court                    20-13368

any costs from revenues because Fintech never produced any hard-cost calculations.

Because Fintech didn't provide any evidence from which a reasonable jury could conclude that its marginal costs were *zero*, the district court erred in denying iControl's JMOL motion on damages. *See Crain Auto. Grp., Inc. v. J&M Graphics, Inc.*, 427 So.2d 300, 301–02 (Fla. 3d DCA 1983) (rejecting damages evidence that "did not explain what calculations and deductions" went into its estimate as "too speculative"). Even reading the evidence in the light most favorable to Fintech, it would be a bridge too far to conclude that the jury could have reasonably found its marginal costs to be zero when the only benchmark amounts offered at trial were "minimal," "three percent," and "ten percent."

★  ★  ★

The damages calculation in this case presents difficult legal and factual questions. Although FUTSA's damages provision doesn't require fixed-cost deduction, Fintech was required to deduct its marginal costs. Because it didn't conclusively prove that its marginal costs were zero, it wasn't entitled to its full amount of lost revenues. On remand, the district court should require an accounting of marginal costs to enable a proper lost-profits calculation.

## C

Finally, Fintech's requested injunction. We review denials of injunctive relief for abuse of discretion. *Common*

*Cause/Georgia v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009). As we have explained before, an injunction must be narrowly tailored to the proven legal violations and restrain no more conduct than reasonably necessary. *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003). It must also describe the restrained acts in reasonable detail such that there is no uncertainty or confusion as to the conduct proscribed. *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235 (11th Cir. 2018); Fed. R. Civ. P. 65(d)(1)(C).

> FUTSA permits injunctive relief in the following terms:
>
> Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional reasonable period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

Fla. Stat. § 688.003(1). As the statute indicates, an injunction under FUTSA should ordinarily be for a specified period of time, which may be extended under certain circumstances. *See Premier Lab Supply*, 94 So.3d at 645 (noting that injunctive relief under FUTSA is time-limited); Restatement (Third) of Unfair Competition § 44, cmt. f (Am. Law. Inst. 1995) (noting that in the trade-secret context, an injunction must be time-limited and last "only until the defendant could have acquired the information by proper means"). An unlimited injunction runs the risk of restraining legitimate competition.

In its first motion, Fintech sought a blanket injunction "prohibiting iControl from doing business in the regulated commerce industry."  The district court correctly denied the motion on the ground that FUTSA only "authorizes the injunction of specific, identifiable trade secrets," not "blanket restraint of competition." *See Norton v. Am. LED Tech., Inc.*, 245 So. 3d 968, 969 (Fla. 1st DCA 2018) ("[F]UTSA may not be used as a vehicle to restrict competition.").  In its renewed motion, Fintech claimed to narrow the scope of its requested injunction as follows:

> iControl's misappropriation . . . included aspects of every part of Fintech's regulated commerce software system. . . . Accordingly, Fintech seeks a permanent injunction prohibiting iControl from using Fintech's proprietary regulated commerce software[.] . . . Because Fintech's trade secrets were incorporated into iControl's Harmony software, Fintech further seeks an injunction prohibiting iControl from using its Harmony software[.] . . . Fintech also seeks a permanent injunction prohibiting iControl from using its Next Gen Reconciliation software, which misappropriated Fintech's method and process for developing and including information in its broken case and price discrepancy reports.

The district court denied the revised injunction as well, concluding that it "sweeps too broadly and promotes confusion about the nature of Fintech's trade secrets."

As a practical matter, Fintech's second motion just used more words to seek fundamentally the same result—namely, to eliminate iControl from "the regulated commerce industry." Fintech's revised proposal continued to resemble a blanket restraint on competition prohibited under FUTSA. Moreover, Fintech's proposed injunction wasn't narrowly tailored and didn't identify specific acts to be restrained.[9] For one, Fintech sought to enjoin iControl not only from using Fintech's software, but also from using *its own* software. A blanket prohibition on using both software packages fails the requirement that only "specific, identifiable trade secrets" be enjoined and leads to the impermissible conclusion that the entirety of Fintech's software is a trade secret. And Fintech wanted the injunction to last forever, which violates FUTSA's plain terms indicating that an injunction must be terminated when the trade secret has ceased to exist. Indeed, Fintech's own expert admitted that iControl "certainly" could have developed the "specific functionality" he described as Fintech's trade secrets "[g]iven time." So there are no circumstances in which

---

[9] Fintech claims that its "trade secrets sufficiently identify the conduct [to be] restrained." But remember, the jury returned a general verdict, so we don't know which trade secrets in particular the jury found iControl had misappropriated. Fintech ignores the fact that even if the district court were to issue an injunction, the court must make its own factual determinations as to which alleged trade secrets were misappropriated. *See McCarthy v. Fuller*, 810 F.3d 456, 460 (7th Cir. 2015). The jury verdict alone does not automatically entitle Fintech to an injunction.

Fintech should be awarded a permanent injunction of unlimited duration.[10]

Fintech's revised proposed injunction swept as broadly as its first. The district court did not abuse its discretion in denying injunctive relief.

## III

The district court's judgment with respect to iControl's liability and Fintech's request for a permanent injunction is affirmed. We reverse the district court's judgement on damages and remand for a proper calculation and deduction of marginal costs.

**AFFIRMED** in part, **REVERSED** and **REMANDED** in part.

---

[10] We find unavailing Fintech's argument that the district court was mistaken in concluding that "[a]ny misappropriation by iControl occurred more than five years ago . . . , and nothing offered by Fintech establishes . . . that iControl could not independently have developed between then and now any trade secret then acquired from Fintech." Whether the "five years" figure was supported by the evidence at trial is irrelevant because, in any event, Fintech did not establish that it should be awarded an injunction of unlimited duration. And it was Fintech's—not the district court's—responsibility to properly time limit the injunction based on the evidence at trial. *See United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("[T]he moving party must satisfy the court that [injunctive] relief is needed. The necessary determination is that there exists some cognizable danger of recurrent violation . . . .").